IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:17–CV–00025–BR

HATTERAS/CABO YACHTS, LLC,      )
a foreign limited liability company,   )
                                )
                 Plaintiff,     )
      v.                        )                ORDER
                                )
M/Y EPIC (Official Number 747618,   )
HIN: US-HATHR3021617), her engines,  )
Boilers, tackle, apparel etc., in rem, and  )
AQUAVIVA LTD., a foreign company,   )
                                )
                 Defendants.    )

This matter is before the court on Hatteras/Cabo Yachts, LLC's ("Hatteras") motion for

summary judgment as to Counts 1−7, 12, 14, and 15 of Acquaviva Ltd. ("Acquaviva") and

Daniel Spisso's (collectively "Spisso")[1] Second Amended Counterclaim ("Counterclaim"), (DE

# 122); Versa Capital Management, LLC's ("Versa") motion for summary judgment as to Counts

1, 2, 5, 8−14 of the Counterclaim, (DE # 119);[2] and Brunswick Corporation's ("Brunswick")

motion for summary judgment as to Counts 1, 2, 5, 8−10, 13, and 14 of the Counterclaim,[3] (DE #

116). Also before the court is Spisso's motion for summary judgment on Counts 2, 6, and 7 of

---

[1] On occasion the court refers to Spisso in his individual capacity, with regards to actions he personally took, e.g. signing the Agreement.
[2] Versa purportedly seeks summary judgment on counts 11 and 12, but makes no argument specific to these counts. (See Versa Mot. Summ. J., DE # 119, at 1; Versa Mem. Supp., DE # 120, at 1, 3.) Because Versa's purported liability in counts 11 and 12 stems from its alleged relationship with Hatteras, (see Second Am. Countercl., DE # 99, at 75−77), these claims will be considered in light of Versa's arguments regarding that theory of liability.
[3] Brunswick's motion seeks summary judgment on "Counts 1, 2, 5, 8, 9, 10, 13, and 14," (Brunswick Mot. Summ. J., DE # 116, at 1), but also on "Counts 1, 2, 5, and 8-14," (id. at 2). Brunswick's memorandum in support purportedly seeks summary judgment on "Counts 1, 2, 5, 8, 9, 10, 13, and 14," (Brunswick Mem. Supp., DE # 117, at 1), but its conclusion section includes counts 6, 7, 12, and 15, (id. at 18). Counts 11 and 12 allege Hatteras was acting on its own and as an agent of Versa, thus these counts do not apply to Brunswick. (Second Am. Countercl., DE # 99, at 75−76.) Counts 6 and 7 concern warranties allegedly made by Hatteras. (Id. at 59, 65.) Count 15 alleges unjust enrichment against Hatteras only. (Id. at 85.) Therefore, as to Brunswick's motion for summary judgment, the court addresses only counts 1, 2, 5, 8-10, 13, and 14.

the Counterclaim, (DE # 125), and Acquaviva's motion for summary judgment on all claims alleged in Hatteras's original verified complaint, (DE # 130-1). These motions have been fully briefed and are ripe for disposition.

## I.     BACKGROUND

This action arises out of disputes regarding the purchase of two yachts. Spisso, Acquaviva's agent, first entered into a sales contract with the Hatteras Yachts division of Brunswick for the construction of a model GT63 ("Vessel No. 1"), in December 2012. (Brunswick Statement of Facts, DE # 118, ¶ 2; Spisso Resp. to Brunswick Statement of Facts, DE # 151, ¶ 2.) In August 2013, Hatteras purchased substantially all of the assets of the Hatteras Yachts division of Brunswick. (Brunswick Statement of Facts, DE # 118, ¶ 3; Spisso Resp. to Brunswick Statement of Facts, DE # 151, ¶ 3.) In December 2014, Spisso filed suit in the Southern District of Florida, Case No. 1:14-cv-24616-FAM, alleging breach of contract, breach of warranties, and violation of the Magnuson-Moss Warranty Act, and seeking rescission, revocation, and damages arising from the purchase of Vessel No. 1. (See Brunswick Statement of Facts, DE # 118, ¶ 7; Spisso Resp. to Brunswick Statement of Facts, DE # 151, ¶ 7.) In April 2015, Spisso entered into a settlement agreement ("Agreement") which purported to resolve the litigation surrounding Vessel No. 1 and constituted a purchase/sale of Vessel No. 2. (Brunswick Statement of Facts, DE # 118, ¶ 8; Spisso Resp. to Brunswick Statement of Facts, DE # 151, ¶ 8.)

On 17 September 2016, one day into its maiden voyage, Vessel No. 2 caught fire with Spisso and guests onboard. (Brunswick Statement of Facts, DE # 118, ¶¶ 17, 19; Spisso Resp. to Brunswick Statement of Facts, DE # 151, ¶¶ 17, 19.) Thereafter, Vessel No. 2 was returned to shore where Hatteras took custody of it. (Compl., DE # 1, ¶ 8; Acquaviva Answer, DE # 30, ¶

2

8.)  Hatteras notified Spisso that expenses for necessaries were accruing while the vessel remained in its possession.  (Compl., DE # 1, ¶¶ 11–16; Acquaviva Answer, DE # 30, ¶¶ 11–16.)  The vessel remained at Hatteras's dock until Spisso ultimately retook possession of the vessel in February 2017.  (Compl., DE # 1, ¶ 19; Acquaviva Answer, DE # 30, ¶ 19.)  During that five month period, Hatteras alleges that the costs associated with the provision of necessaries totaled $24,340.52.  (Compl., DE # 1, ¶ 17.)

"Hatteras commenced this action against Vessel No. 2, in rem, and Acquaviva, in personam, on 2 March 2017.  On 4 June 2018, the court denied Acquaviva's motion to dismiss.  Acquaviva counterclaimed on 18 June 2018[.]"  (Order, DE # 57, at 2.)

> On 24 August 2018, Hatteras moved to dismiss Acquaviva's 18 June 2018 counterclaim.  "Thereafter, Spisso filed a motion to intervene as defendant and counterclaim [against Hatteras] and attached an amended counterclaim on behalf of himself and Acquaviva."  On 10 January 2019, this court allowed Spisso's motion to intervene by interlineation and allowed Acquaviva and Spisso to amend their counterclaim.  As such, the court denied Hatteras'[s] motion to dismiss the 18 June 2018 counterclaim.

(Order, DE # 168, at 2 (citations omitted).)  Hatteras, Brunswick, and Versa (collectively "counterclaim defendants") then each moved to dismiss the amended counterclaim.  (DE ## 59, 85, 87.)  The court denied all three motions to dismiss but granted Brunswick's and Versa's motions for more definite statements as to counts 5, 8, 10, and 14 of the amended counterclaim.  (Order, DE # 98.)  Spisso then filed a second amended counterclaim, on which counterclaim defendants each now seek summary judgment.

### III. DISCUSSION

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute

3

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. A fact is material if its existence or non-existence affects the disposition of the case. Id. The party seeking summary judgment must first demonstrate the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must [then] come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247–48 (emphases in original). In determining whether a genuine issue of material fact exists, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). When considering cross-motions for summary judgment, the court should "consider and rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." Monumental Paving & Excavating, Inc. v. Penn. Mfr. Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999).

### A. Brunswick's Motion for Summary Judgment as to the Counterclaim

#### 1. *Counts 2, 8, 9, 10, and 14*

Counts 2, 8, 9, 10, and 14 (in part) relate to Vessel No. 2. (See Second Am. Countercl., DE # 99.) Specifically, count 2 alleges breach of the Agreement; count 8 alleges violations of the Magnuson-Moss Warranty Act pertaining to Vessel No. 2; counts 9 and 10 allege negligent property damage and negligent bodily injury stemming from the fire aboard Vessel No. 2; and

4

count 14 alleges violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA").  (Id.)

Brunswick moves for summary judgment on these counts, contending "it was not a party to the contract to purchase [Vessel No. 2], and Hatteras was not its agent for purposes of any dealings with [] Spisso or Acquaviva."  (Brunswick Mem. Supp., DE # 117, at 2.)  According to Brunswick, it sold the Hatteras Yachts division in 2013 and was uninvolved with the sale, construction, delivery, or fire aboard Vessel No. 2.  (Id. at 16.)  Spisso claims Brunswick was a party to the Agreement or, alternatively, is liable on the contract based on principles of agency.  (See Spisso Mem. Opp'n, DE # 152, at 4–5.)

### a.  Third-party beneficiary

In 2015, Spisso entered the Agreement, which purported to resolve his claims regarding Vessel No. 1 and constituted his purchase of Vessel No. 2.  Spisso first argues, and Brunswick agrees, Brunswick is an intended third-party beneficiary of the Agreement.  (Spisso Mem. Opp'n, DE # 152, at 4; Brunswick Reply, DE # 176, at 4; see Second Am. Countercl., DE # 99, at 56.)  Spisso contends this status makes Brunswick a party to the Agreement and thus makes Brunswick liable for the alleged breach thereof along with harms he suffered relating to Vessel No. 2.  (See Spisso Mem. Opp'n, DE # 152, at 4–5.)

"A settlement agreement is a contract governed by the rules of contract interpretation and enforcement."  Williams v. Habul, 724 S.E.2d 104, 110 (N.C. Ct. App. 2012) (citations omitted).  It is well established that an intended third-party beneficiary may sue for breach of a contract entered for its benefit.  Snyder v. Freeman, 266 S.E.2d 593, 603–04 (N.C. 1980); see also Vogel v. Reed Supply Co., 177 S.E.2d 273, 278 (N.C. 1970) ("[T]here is general agreement that a third party may enforce a contract to which he was not privy but which was made for his benefit.").

5

However, to be liable for breach, one must be a party to the contract. Howe v. Links Club Condo. Ass'n, 823 S.E.2d 439, 448 (N.C. Ct. App. 2018). An intended third-party beneficiary is not a party to the contract itself, but merely receives some benefit from it.

Here, although Brunswick may have some rights under the Agreement as a third-party beneficiary, such status in and of itself does not subject it to liability thereon. Spisso's claims against Brunswick relating to Vessel No. 2 cannot survive summary judgment on this basis.

### b. Agency

Alternatively, Spisso claims Brunswick should be liable on the counts relating to Vessel No. 2 because Hatteras acted as its agent, either actual or apparent, in procuring the Agreement. (Spisso Mem. Opp'n, DE # 152, at 5–6.) Brunswick contends it did not authorize Hatteras to act with regard to the Agreement, nor did Hatteras consent to do so. (Brunswick Mem. Supp., DE # 117, at 17.)

"[A]n agent is one who acts for or in the place of another by authority from him. Two factors are essential in establishing an agency relationship: (1) the agent must be authorized to act for the principal; and (2) the principal must exercise control over the agent." Sullivan v. Pugh, 258 N.C. App. 691, 695 (N.C. Ct. App. 2018) (quoting Leiber v. Arboretum Joint Venture, LLC, 702 S.E.2d 805, 811 (N.C. Ct. App. 2010)). "Additionally, both parties must consent that the agent will act on behalf of the principal in a particular capacity. Agency is a relationship 'which cannot be forced on a person *in invitum*.'" State v. Weaver, 607 S.E.2d 599, 606 (N.C. 2005) (internal citation omitted) (quoting Johnson v. Orrell, 56 S.E.2d 414, 417 (N.C. 1949)).

In support of its motion, Brunswick relies on the declaration of its employee, Juli Foran, who testifies: "Hatteras[] has never operated as a division of Brunswick;" "Brunswick did not provide Hatteras[] with authority to act on its behalf in negotiating or entering the [Agreement];"

6

and "Hatteras[] never consented to act on behalf of Brunswick in negotiating or entering into the [Agreement]." (Foran Decl., DE # 118-2, at 2–3.) Foran further states, "Brunswick did not have any control over Hatteras['s] negotiations with [] Spisso for the [Agreement], nor did it have control over the ultimate terms of that [A]greement." (Id. at 2–3.)

In response, Spisso contends "the evidence indicates that [Brunswick] did so authorize Hatteras to so act and that Hatteras did consent," (Spisso Mem. Opp'n, DE # 152, at 5), citing only to one provision of the Agreement, (id. at 6). That provision states: "On August 5[,] 2013, Hatteras purchased substantially all of the assets and assumed certain of the liabilities of [the Hatteras Yachts Division] from Brunswick Corporation." (Agreement, DE # 128-11, at 2.) He argues this language was intended to "assure Mr. Spisso that Hatteras had assumed *this particular* liability[.]" (Id. (emphases in original).) He contends "[t]he most reasonable inferences to be drawn from the inclusion of such a representation are that: (i) Hatteras was making a representation about its assumption in order to demonstrate Hatteras's *authority* to act on Brunswick's liability; and (ii) Hatteras had *consented* to do what it was in fact doing." (Id. (emphasis in original).) Spisso cites no other evidence in support of his argument.

This argument is insufficient to rebut Brunswick's supported motion for summary judgment. While the court draws all reasonable inferences in favor of the nonmoving party, arguments of counsel, conclusory allegations, or the building of interferences cannot create a genuine issue of material fact. Dash v. Mayweather, 731 F.3d 303, 324 (4th Cir. 2013) (citations omitted); Howard v. Lakeshore Equip. Co., 482 F. App'x 809, 810 (4th Cir. 2012) ("Mere conclusory allegations are insufficient to support the nonmoving party's case." (citation omitted)). Rather, when "the movant has met its burden, the nonmoving party then must affirmatively demonstrate, with specific evidence, that there exists a genuine issue of material

fact requiring trial." Spivey v. Research Triangle Reg'l Pub. Transp. Auth., No. 5:14-cv-44, 2015 U.S. Dist. LEXIS 124775, at *28 (E.D.N.C. Aug. 10, 2015); see also Founders Ins. Co. v. Richard Ruth's Bar & Grill LLC, 761 F. App'x 178, 181 (4th Cir. 2019) ("[T]he nonmoving party has the burden to offer sufficient proof in the form of admissible evidence to show that there is a genuine issue of material fact for trial." (citation omitted)).  Absent additional evidence, the court cannot draw the multiple inferences Spisso suggests from one sentence in the Agreement.  As such, Spisso's claims against Brunswick related to Vessel No. 2 cannot survive summary judgment based on his allegation of actual agency.

In the absence of an actual agency relationship, a party may be liable for the acts of another based on the doctrine of apparent agency.  Sweatt v. Wong, 549 S.E.2d 222, 227 (N.C. Ct. App. 2001). Apparent agency arises when "'a person by words or conduct represents or permits it to be represented that another person is his agent' when no actual agency exists." Phillips v. Rest. Mgmt. of Carolina, L.P., 552 S.E.2d 686, 695 (N.C. Ct. App. 2001) (quoting Knight Publ'g Co. v. Chase Manhattan Bank, 479 S.E.2d 478, 487 (N.C. Ct. App. 1997)). Apparent agency may not be relied upon to assert that a principal authorized a transaction "'unless the third party *actually relied* upon the assertions of the principal regarding the purported agent's power at the time of the transaction.'"  Phillips, 552 S.E.2d at 695 (quoting Knight, 479 S.E.2d at 487); see also Hoffman v. Moore Regional Hosp., 441 S.E.2d 567, 570 (N.C. Ct. App. 1994) (noting a principal is liable for harm caused by its apparent agent "if the third party justifiably relied on the principal's representations").

In support of his apparent agency argument, Spisso again relies on the sentence from the Agreement stating that Hatteras purchased certain liabilities of Brunswick.  (Spisso Mem. Opp'n, DE # 152, at 6.)  However, he has not cited any evidence from which one could conclude that

8

Brunswick represented that Hatteras was its agent or that Spisso actually relied on such a representation in entering the Agreement. As such, Spisso has failed to offer sufficient evidence to show Hatteras acted as an apparent agent of Brunswick.

Finally, Spisso contends "even if no agency relationship ever existed or appeared to exist, one arose when Brunswick ratified Hatteras's acts on its behalf." (Spisso Mem. Opp'n, DE # 152, at 6.) He contends Brunswick ratified Hatteras's actions by "seeking to enforce the [Agreement's] release but also by seeking to enforce [its] forum selection clause in the Florida state court action." (Id.) Brunswick concedes that it did move to dismiss or transfer the Florida case and is seeking enforcement of the release in this case. (Brunswick Reply, DE # 176, at 10.) However, Brunswick contends these actions are consistent with its status as a third-party beneficiary of the Agreement. (Id.)

"[R]atification is a legal doctrine that binds a principal to certain unauthorized acts of an agent, such as executing a contract." IO Moonwalkers, Inc. v. Banc of Am. Merch. Servs., LLC, 814 S.E.2d 583, 586 (N.C. Ct. App. 2018) (citing Carolina Equip. & Parts Co. v. Anders, 144 S.E.2d 252, 258 (N.C. 1965)). Although an agency relationship need not already be established, see CitiMortgage, Inc. v. Sea Horse Realty & Constr., Inc., No. 2:13-cv-44, 2013 U.S. Dist. LEXIS 146005, at *17 (E.D.N.C. Oct. 9, 2013) (recognizing a principal may ratify acts of someone "who in point of fact is not an agent"), "ratification is not possible unless the person making the contract [], in doing so, purported to act as the agent of the person claiming or claimed to be the principal," Patterson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 146 S.E.2d 390, 393 (N.C. 1966) (citation omitted).

In Citi Mortgage, the court held the sole shareholder was not purporting to act on behalf of the company when he executed a note and demand deed in his own name but pledged the

company's property as security.  2013 U.S. Dist. LEXIS 146005, at *4−5, 18.  The court held the individual "was not signing a contract that required action by the corporation.  He was not otherwise purporting to act for [the corporation], but rather was obtaining a loan for himself." Id. at 18−19.  Thus, because he signed a contract in his own name, only obligating himself to act, the court held there could be no ratification by the company of his action.  Id.

> In order to establish the act of a principal as a ratification of the unauthorized transactions of an agent, the party claiming ratification must prove (1) that at the time of the act relied upon, the principal had full knowledge of all material facts relative to the unauthorized transaction, and (2) that the principal had signified his assent or his intent to ratify by word or by conduct which was inconsistent with an intent not to ratify.

IO Moonwalkers, 814 S.E.2d at 586 (quoting Carolina Equip., 144 S.E.2d at 258).

As discussed above, Spisso cannot show that in entering the Agreement Hatteras was acting as Brunswick's agent.  Spisso has likewise failed to show that Hatteras *purported* to act as Brunswick's agent in entering the Agreement or that Brunswick had full knowledge of all facts material to that transaction.  Rather, the evidence is consistent with Brunswick's assertion that its actions are in line with its status as a third-party beneficiary, who, as discussed previously has the right to enforce a contract made for its benefit.  Accordingly, there is insufficient evidence of ratification to survive summary judgment.

Because Brunswick's purported liability in counts 2, 8, 9, 10, and 14 (to the extent it relates to Vessel No. 2) rests on Spisso's assertions that Brunswick was a party to the Agreement, an agent of Hatteras, or ratified Hatteras's actions—all of which may be decided as a matter of law—Brunswick is entitled to summary judgment on those counts.

### 2. *Counts 1, 5, 13, and 14*

Count 1 alleges breach of contract relating to the purchase of Vessel No. 1; count 5 alleges breach of the Magnuson-Moss Warranty Act relating to Vessel No. 1; and count 14

alleges violations of UDTPA. (Second Am. Countercl., DE # 99, at 37, 55, 79.) Count 13, for

bad faith, relates primarily to Vessel No. 2. (Id. at 78.) Brunswick contends it is entitled to

summary judgment on these counts based on the doctrine of res judicata because "the same

claims were dismissed *with prejudice* in the Southern District of Florida."[4] (Brunswick Mem.

Supp., DE # 117, at 11 (emphasis in original).) In response, Spisso contends Brunswick waived

the affirmative defense of res judicata and his

> voluntary dismissal with prejudice does not preclude his current claims for at least
> two reasons: Mr. Spisso's stipulated dismissal does not survive rescission of the
> agreement that obligated him to make it; and, even if it did, the identity of claims
> required for res judicata does not exist here.

(Spisso Omnibus Mem. Opp'n, DE # 155, at 7.)

Res judicata is an affirmative defense which must be pled. Ga. Pac. Consumer Prods., LP

v. Von Drehle Corp., 710 F.3d 527, 533 (4th Cir. 2013). "An affirmative defense may be

pleaded in general terms and will be held to be sufficient . . . as long as it gives plaintiff fair

notice of the nature of the defense." Clem v. Corbeau, 98 F. App'x 197, 203 (4th Cir. 2004)

(citations omitted). "To determine whether the plaintiff has fair notice of the defense, the [c]ourt

considers whether 'the challenged defenses are contextually comprehensible and possibly related

to the controversy.'" Benedict v. Hankook Tire Co., No. 3:17-cv-109, 2018 U.S. Dist. LEXIS

26129, at *5−6 (E.D. Va. Feb. 16, 2018) (citation omitted). Failure to raise an affirmative

defense may, but does not necessarily, result in waiver of that defense. Clem, 98 F. App'x at

203−04; Armbruster Prods.v. Wilson, No. 93-2427, 93-2428, 93-2429, 1994 U.S. App. LEXIS

24796, at *8 (4th Cir. Sept. 12, 1994) ("It is well established that waiver does not automatically

follow from the failure of a defendant to raise an affirmative defense in the answer." (citation

---

[4] Brunswick also alleges it is entitled to summary judgment on these counts based on the Agreement's release
provision and the doctrine of collateral estoppel. (Brunswick Mem. Supp., DE # 117, at 2.) However, because res
judicata is determinative, the court need not address these agreements.

omitted)); see also Ga. Pac., 710 F.3d at 535 (recognizing district court's right to raise res judicata sua sponte in special circumstances); Eriline Co. S.A. v. Johnson, 440 F.3d 648, 655 (4th Cir. 2006) (recognizing that in "special circumstances" a district court may sua sponte raise res judicata.). Rather, the plaintiff must also show prejudice or unfair surprise. Clem, 98 F. App'x at 203−04; Armbruster, 1994 U.S. App. LEXIS 24796, at *8.

Here, Brunswick pled:

**Affirmative Defense No. 19 & 20 – Waiver & Estoppel**
19. All claims related to Vessel 1 are barred/waived by virtue of the Release and Settlement Agreement dated April 8, 2015.

20. Counterclaim Plaintiffs filed a voluntary dismissal with prejudice of the lawsuit related to Vessel 1, and Counterclaim Plaintiffs are therefore barred or estopped from raising claims related to Vessel 1 in the captioned lawsuit.

(Brunswick Answer, DE # 107, at 40.) This pleading specifically references the Agreement and the voluntary dismissal filed by Spisso. Thus, Spisso's argument that "there have been four separate lawsuits involving the parties and so even a reference to litigation would have left Mr. Spisso guessing," (Spisso Omnibus Mem. Opp'n, DE # 155, at 6), is without merit. Given the facts and circumstances of this case, permitting Brunswick to proceed on a res judicata defense is not so prejudicial or unfair to warrant waiver, even assuming it was insufficiently pled.

The parties agree that federal res judicata law applies here. (Spisso Omnibus Mem. Opp'n, DE # 155, at 7; Brunswick Reply, DE # 184, at 8.)

Under the doctrine of res judicata, claims asserted in a subsequent suit may be barred by a prior adjudication if three requirements are met: (1) The first suit must have concluded in a final judgment on the merits; (2) The second suit must involve the assertion of claims by persons who were parties or in privity with parties in the first suit; and (3) The claims asserted in the second suit must be based on the same cause of action as the first suit.

Kenny v. Quigg, 820 F.2d 665, 669 (4th Cir. 1987); see also Chin-Young v. United States, 774 F. App'x 106, 114 (4th Cir. 2019). A voluntary dismissal with prejudice—even one resulting

from a settlement agreement—constitutes a final judgment on the merits. <u>Kenny</u>, 820 F.2d at 669; <u>see also</u> <u>Singletary v. Cumberland Cnty. Sch.</u>, No. 5:12-cv-744, 2016 U.S. Dist. LEXIS 32429, at *44 (E.D.N.C. Feb. 12, 2016). The courts in the Fourth Circuit follow the "transactional approach," under which "res judiciata will bar a 'newly articulated claim[]' if it is based on the same underlying transaction and could have been brought in the earlier action." <u>Clodfelter v. Republic of Sudan</u>, 720 F.3d 199, 210 (4th Cir. 2013) (quoting <u>Laurel Sand & Gravel, Inc. v. Wilson</u>, 519 F.3d 156, 162 (4th Cir. 2008)). "This includes 'all grounds for, or defenses to, recovery that were previously available to the parties, *regardless of whether they were asserted.*'" <u>Thomas v. Craige</u>, No. 7:19-cv-181, 2020 U.S. Dist. LEXIS 61367, at *8 (E.D.N.C. Apr. 7, 2020) (quoting <u>Meekins v. United Trasp. Union</u>, 946 F.2d 1054, 1057 (4th Cir. 1991) (emphasis added)). "[Res judicata] is a 'practical doctrine' that looks to whether a party 'has previously had a fair shot with respect to the claims raised in the present action.'" <u>Chin-Young v. United States</u>, 774 F. App'x 106, 114 (4th Cir. 2019) (quoting <u>SAS Inst., Inc. v. World Programming Ltd.</u>, 874 F.3d 370, 378 (4th Cir. 2017)).

Here, it is undisputed that in December 2014, Spisso filed a complaint against Brunswick and Hatteras in the Southern District of Florida, relating to Vessel No. 1. (Brunswick Mem. Supp., DE # 117, at 11; Spisso Resp. to Brunswick Statement of Facts, DE # 151, ¶ 7.) In that action, Spisso filed claims for breach of contract (seeking rescission and revocation), breach of express warranties, breach of implied warranties, and violation of the Magnuson-Moss Warranty Act relating to the 2012 contract to purchase Vessel No. 1. (<u>See</u> Florida Compl., DE # 117-2.) The pertinent facts underlying the Florida lawsuit include:

> On or about December 12, 2012, Plaintiff entered into a contract with Brunswick for the construction of a yacht for which Plaintiff would pay $3,027,000.00. At that time, Plaintiff paid Brunswick a deposit in the amount of $20,000.00.

Plaintiff had engaged a licensed ship captain to operate the yacht to Miami and, during its maiden trip, the yacht malfunctioned repeatedly and significantly. Among other problems, the yacht's electronics system failed.

Between December 2013 and November 2014, Plaintiff reported more than 200 issues or items of defect with the yacht. Among the most significant are: a malfunctioning bilge pump; water intrusion in the engine room and throughout the interior of the yacht, from steps to ceilings; failing electronics; and faulty wiring. The yacht is not seaworthy or safe.

The Hatteras Defendants have refused to accept rescission or revocation, insisting on endless opportunities to cure the yacht's problems. . . .

(Id. at 3–4.)  The parties settled all disputes related to Vessel No. 1 by the Agreement, and Spisso filed a voluntary dismissal with prejudice.  (Brunswick Mem. Supp., DE # 117, at 11; Agreement, DE # 128-11; Dismissal, DE # 117-3.)

In addition to claims relating to Vessel No. 2 in this action, Spisso brings claims for breach of contract, breach of implied warranty, breach of express warranty, and violations of the Magnuson-Moss Warranty Act relating to Vessel No. 1.  (Second Am. Countercl., DE # 99, at 37, 49, 53, 55.)  The underlying facts pled in support of counts 1, 5, and 14 (to the extent it relates to Vessel No. 1) are nearly identical to those pled in support of the Florida lawsuit. (Compare Florida Compl., DE # 117-2, at 3–4, with Second Am. Countercl., DE # 99, at 9–12.)

Spisso does not attempt to argue that the claims asserted here are based on a different underlying transaction rather, he alleges, "none of the claims that [he] raised in this action had accrued when [he] dismissed his first lawsuit."  (Spisso Omnibus Mem. Opp'n, DE # 155, at 9.) He contends the Agreement was to serve as a cure for breaches of the Vessel No. 1 purchase agreement.  (Id. at 8.)  Thus, he asserts that every breach of the Agreement constitutes a further breach of that purchase agreement.  (Id.)  This argument is offered without support and fails to establish how counts 1 and 5 of this action—which mirror counts 1, 2, and 5 of the Florida litigation—had not accrued when he filed the voluntary dismissal of that action.

14

Finally, Spisso without citation to any authority asserts: "A stipulated voluntary dismissal has no greater power than the agreement that authorized it." (Spisso Omnibus Mem. Opp'n, DE # 155, at 8.) Thus, he argues, res judicata fails because the Agreement, which obligated him to file the voluntary dismissal, should be rescinded based on Hatteras's breach of the Agreement. (Id.) Irrespective of any breach of the Agreement, the voluntary dismissal entered in Florida is a valid, final judgment on the merits. See Singletary, 2016 U.S. Dist. LEXIS 32429, at *44 ("It is well established that dismissals with prejudice—including those resulting from settlement agreements or consent decrees—are treated as final judgments on the merits for the purposes of res judicata." (citation omitted)); Estate of Barber v. Guilford Co. Sheriff's Dep't, 589 S.E.2d 433, 437 (N.C. Ct. App. 2003) (noting with a voluntary dismissal in place, a party is limited to a new action for breach of the settlement agreement). Counts 1 and 5 in this action are based entirely on the same underlying transactions as the claims asserted in the Florida litigation, and Spisso was the complainant in both actions. Therefore, res judicata bars relitigation of those claims.

The allegations in count 13 of this action relate primarily to Vessel No. 2. Because Vessel No. 2 had not yet been purchased or constructed, claims relating to it were not and could not have been brought in the Florida lawsuit. Thus, this count is not barred by res judicata. The only potential allegation against Brunswick in count 13 relates to purported deception during the negotiation of the Agreement and failure to preserve evidence after the fire. (Second Am. Countercl., DE # 99, at 79.) However, pursuant to the discussion above, Brunswick is entitled to summary judgment on this count because there is no genuine issue of fact regarding whether it was acting as Hatteras's agent in claims relating to Vessel No. 2.

15

Count 14 alleges violations of UDTPA. Specifically, as to Vessel No. 1, Spisso alleges: "Hatteras refused, without a reasonable basis in fact or law, to recognize rejection, or revocation of acceptance, of [the vessel]." (Second Am. Countercl., DE # 99, ¶ 317(a).) The underlying transaction for this claim is the same as that underlying the Florida litigation; in fact, Spisso pled an almost identical allegation therein. (See Florida Compl., DE # 117-2, at 4.) Thus, the basis for count 14, to the extent it relates to Vessel No. 1, could have been brought in the Florida litigation and therefore, cannot be maintained here. The remaining allegations of count 14 are alleged against Brunswick as an agent of Hatteras. Because the court has already determined Hatteras was not acting as an agent of Brunswick in the negotiation of the Agreement, Brunswick is entitled to judgment on count 14 in its entirety.

Brunswick is entitled to judgment on counts 1, 2, 5, 8–10, 13, and 14.

### B. Versa's Motion for Summary Judgment as to the Counterclaim

Counts 1 and 2 allege breach of the respective purchase contracts for each vessel. As to those counts, Versa contends it is entitled to summary judgment "because it was not a party to the purchase contracts for either vessel, nor was it a principal of any party to either contract." (Versa Mem. Supp., DE # 120, at 4.) Comparably, as to counts 5 and 8, which allege violations of the Magnuson-Moss Warranty Act, Versa contends it is entitled to summary judgment "because it never issued any warranty and has no liability for any purported breach of warranty by Hatteras under any agency or alter ego theory." (Id. at 6.) As to counts 9 and 10 for negligent property damage and negligent bodily injury, respectively, Versa seeks summary judgment because it was not a party to the contract to build Vessel No. 2 and cannot be liable for Hatteras's alleged negligence because it was not Hatteras's principal. (Id. at 11.) Versa contends it is entitled to summary judgment on count 13 for bad faith because it had no contract with Spisso

and thus owed no duty of good faith and fair dealing. (Id. at 11−12.) Finally, Versa contends it is entitled to summary judgment on count 14 because that count does not allege any specific acts on the part of Versa, and "there is no evidence that Hatteras was Versa's agent with respect to any of those acts." (Id. at 12.)

1. *Third-party beneficiary*

The parties agree Versa is an intended third-party beneficiary of the Agreement. (See Versa Reply, DE # 180, at 8; Spisso Resp. Opp'n, DE # 152, at 10−11.) As with Brunswick, discussed above, this status does not transform Versa into a "party" to the Agreement. Spisso presents no evidence that Versa was a party the 2012 agreement to purchase Vessel No. 1 ("Purchase Agreement"). Thus, Spisso's claims against Versa must survive summary judgment, if at all, based on its purported relationship with Hatteras.

2. *Agency*

Versa contends Spisso cannot establish it was a principal of Hatteras. According to Mike Fram, Versa's managing director, Versa never authorized Hatteras to act on its behalf, nor did Hatteras consent to do so. (Fram Decl., DE # 121-11, at 5.) He also testifies, "Versa did not control the execution of the December 12, 2012 Purchase Agreement for Vessel 1 . . ., or the [Agreement] between Spisso and Hatteras[]." (Id.)

As discussed above, to establish an agency relationship, the parties must consent to the relationship, the agent must be authorized to act on behalf of the principal, and the principal must exercise control over the agent. See Sullivan, 258 N.C. App. at 695 (N.C. Ct. App. 2018) (citation omitted); Weaver, 607 S.E.2d at 606 (citation omitted). Here, Spisso comes forward with evidence that Fram: (1) as managing director of Versa, was tasked with monitoring and assisting in the resolution of the dispute regarding Vessel No. 2 between Hatteras and Spisso,

(see Fram Depo, DE # 135-1, at 17–18, 104–06); (2) served also as interim chief financial officer of Hatteras at the time the Agreement was signed, (id. at 104); (3) participated in the negotiation of the Agreement as well as resolution of other issues involving Hatteras, (id. at 105); (4) signed the Agreement on behalf of Hatteras, (Agreement, DE # 128-11); (5) continued to advise Hatteras in May 2016 and was serving as interim chief executive officer of Hatteras at the time of the fire on Vessel No. 2, (Fram Depo, DE # 135-1, at 104). Fram's deposition makes clear that part of his job as managing director of Versa included advising, assisting, and monitoring Hatteras and its management team, specifically with regard to issues between Hatteras and Spisso relating to Vessel No. 2. (Id. at 105−06.) Each of these arguments pertain to Versa's purported involvement in the sale and construction of Vessel No. 2.

Viewing the evidence in the light most favorable to Spisso as the non-movant and mindful that "[t]ypically, the agency question is a factual determination that must be made by the jury," Leiber, 702 S.E.2d at 811, Spisso's evidence regarding the relationship between Versa and Hatteras, particularly with respect to its transactions with Spisso regarding Vessel No. 2, is sufficient to create a genuine issue of material fact as to whether Hatteras was acting as an agent of Versa for the transactions relating to Vessel No. 2. Therefore, Versa's motion for summary judgment as to agency with regard to counts 2, 8–13, and 14 (to the extent it relates to Vessel No. 2) will be denied.

However, Spisso's reliance on Fram's involvement with both Hatteras and Versa is insufficient to create an issue of fact as to Versa's liability on claims related to Vessel No. 1, as Fram did not become an employee of Hatteras until 2015, two years after the construction of Vessel No. 1. (See Fram Decl., DE # 121-11, at 3.) Spisso makes no other argument to establish an agency relationship between Hatteras and Versa with regard to the transactions surrounding

18

Vessel No. 1.  Versa's motion as to agency with regard to counts 1, 5, and 14 (to the extent it relates to Vessel No. 1) will be granted.

   *3.  Alter Ego*

   Versa also moves for summary judgment contending it cannot be held liable for Hatteras's acts based on the theory of alter ego.  (Versa Mem. Supp., DE # 120, at 8.)  "[C]ourts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or achieve equity.'"  <u>Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.</u>, 689 S.E.2d 143, 147 (N.C. Ct. App. 2009) (quoting <u>Glenn v. Wagner</u>, 329 S.E.2d 326, 330 (N.C. 1985)).  This is "a 'drastic remedy . . . invoked only in an extreme case where necessary to serve the ends of justice.'"  <u>Decat, Inc. v. Jones Legacy Transp., LLC</u>, No. COA19-588, 2020 N.C. App. LEXIS 557, at *5 (N.C. Ct. App. July 21, 2020) (quoting <u>Dorton v. Dorton</u>, 336 S.E.2d 415, 419 (N.C. Ct. App. 1985)).

> To support an attack on a separate corporate entity under the instrumentality rule, a party must satisfy three elements:
>
> '(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.'

<u>Estate of Hurst v. Moorehead I, LLC</u>, 748 S.E.2d 568, 574 (N.C. Ct. App. 2013) (quoting <u>Glenn</u>, 329 S.E.2d at 330–31).  In considering the first element, the court commonly weighs four factors: "(1) inadequate capitalization; (2) noncompliance with corporate formalities; (3)

19

complete domination and control of the corporation so that it has no independent identity; and (4) excessive fragmentation of a single enterprise into separate corporations." Mansfield v. Pierce, No. 96-1904, 1998 U.S. App. LEXIS 17086, at * 9–10 (4th Cir. July 27, 1998) (quoting Atlantic Tobacco Co. Honeycutt, 398 S.E.2d 641, 643 (N.C. Ct. App. 1990)); Glenn, 329 S.E.2d at 332. This inquiry is not based on the presence or absence of any one factor, "[r]ather it is a combination of factors which, when taken together . . . suggest that the corporate entity attacked had no separate mind will or existence of its own.'" Glenn, 329 S.E.2d at 332.

In his declaration, Fram states, "Versa is not an owner nor a subsidiary of Hatteras;" "does not have any ownership interest in [Hatteras];" "has its own, independent management structure;" and "does not control the day to day operations of Hatteras." (Fram Decl., DE # 121-11, at 2, 4.) In response, Spisso contends Fram's deposition testimony that Versa is majority owner of Hatteras[5] creates an issue for the jury that Versa controlled Hatteras, including in the negotiation of the Agreement, and that Fram required Hatteras's management team to report to him. (Spisso Mem. Opp'n, DE # 152, at 8–9.)

Spisso cites no evidence regarding Versa's capitalization, corporate formalities, fragmentation, or finances generally. His argument rests primarily on Fram's having roles in both companies. (See id. at 8.) Although it is undisputed that Fram maintained positions at both companies, the overlap in employees is insufficient alone to warrant treating the two entities as one. See Lee v. Certainteed Corp., 123 F. Supp. 3d 780, 792 (E.D.N.C. 2015) ("The facts that corporations have common officers, occupy common offices, and to a certain extent transact business for each other do not make the one corporation liable for the action of the other, except

---

[5] In support of this contention, Spisso cites the deposition of Mike Fram. (See Fram Depo., DE # 135-1, at 13.) Versa contends Fram "corrected this factual error in his declaration," without citing to any declaration. (Versa Reply, DE # 180, at 3.) In his declaration at docket entry 135-1, Fram swears "Versa has no ownership interest in Hatteras." (Fram Decl., DE # 135-1, at 4.)

upon established legal principles." (quoting B-W Acceptance Corp. v. Spencer, 149 S.E.2d 570 (1966))); Waff Bros., Inc. v. Bank of North Carolina, N.A., 221 S.E.2d 273, 280 (N.C. 1976) (declining to disregard the corporate identities even where "all of the outstanding shares of stock of each of two corporations [were] owned by one individual, who [was] the chief executive officer of each corporation"); Sprouse v. North River Ins. Co., 344 S.E.2d 555, 561 (N.C. Ct. App. 1986) (declining to treat two entities as one although it appeared "that the two corporations are controlled by substantially the same officers"). Comparably, even accepting as true that Versa owned some or all of the shares of Hatteras, "the fact that a corporation owns the controlling stock of another does not destroy the identity of the latter as a distinct legal entity." See B-W Acceptance, 149 S.E.2d at 575 (quoting 19 Am. Jur. 2d Corporations § 717). Thus, Spisso has failed to establish a genuine issue of material fact as to whether Hatteras was an alter ego of Versa. This theory of liability therefore fails as a matter of law.

In summary, Versa's motion will be granted in part and denied in part. Versa is entitled to summary judgment on counts 1, 5, and 14 (to the extent it relates to Vessel No. 1). Versa is entitled to summary judgment on counts 2, 8−13, and 14 (as it relates to Vessel No. 2) to the extent Spisso relies on Versa's status as a third-party beneficiary or an alter ego to establish liability, but these claims may proceed under principles of agency.

### C. Hatteras's Motion for Summary Judgment as to the Counterclaim

#### 1. Counts 1, 3–5, and 14

Counts 1, 3–5, and 14 (in part) relate to Vessel No. 1. These counts allege breach of contract, breach of implied and express warranties, and violations of the Magnuson-Moss Warranty Act and the UDTPA, respectively. Hatteras's summary judgment arguments are nearly identical to those Brunswick raises.

### a. Res Judicata

Like Brunswick, Hatteras also pled:

**Affirmative Defense No. 19 & 20 – Waiver & Estoppel**
19. All claims related to Vessel 1 are barred/waived by virtue of the Release and
Settlement Agreement dated April 8, 2015.

20. Counterclaim Plaintiffs filed a voluntary dismissal with prejudice of the lawsuit
related to Vessel 1, and Counterclaim Plaintiffs are therefore barred or estopped
from raising claims related to Vessel 1 in the captioned lawsuit.

(Hatteras Answer, DE # 109, at 39.)  Therefore, it did not waive its res judicata defense.

For the reasons previously stated, counts 1, 5, and 14 (in part), all of which relate to

Vessel No. 1, are barred by res judicata.  In addition to these claims, as discussed above, Spisso's

Florida complaint also alleged breach of implied and express warranties related to Vessel No. 1.

(Florida Compl., DE # 117-2, at 6–8.)  The facts underlying those in the Florida lawsuit are the

same as those underlying his breach of implied and express warranties claims here.  (Compare

Florida Compl., DE # 117-2, at 6–8, with Second Am. Countercl., DE # 99, at 49–54.)  Thus,

counts 3 and 4 are likewise barred by res judicata.  Hatteras is entitled to summary judgment on

these counts.

### b. Collateral Estoppel

Regarding counts 13 for bad faith[6] and count 14 (to the extent it relates to Vessel No. 2)

for violations of the UDTPA, Hatteras alleges Spisso is barred from relitigating whether Hatteras

engaged in deceptive conduct by

submit[ing] a draft that included a forum-provision selecting North Carolina, and,
when questioned, falsely represent[ing] that Hatteras was merely acting according
to its custom in an effort to hide the existence of a lawsuit filed in the Southern
District of Florida by another purchaser who had a similar experience with Hatteras.

---

[6] Hatteras does not formally move for summary judgment on count 13 in its entirety, but argues it is in part barred
by collateral estoppel.  (See Hatteras Mem. Supp., DE # 123, at 11.)

(Hatteras Mem. Supp., DE # 123, at 11 (quoting Second Am. Countercl., DE # 99, at 35−36).)

Spisso contends Hatteras waived this defense and cannot establish its elements without a genuine issue of material fact. (Spisso Omnibus Mem. Opp'n, DE # 155, at 10.)

Hatteras contends it properly pled collateral estoppel by pleading:

**Affirmative Defense No. 13 - Equitable Defenses**

13. Plaintiffs' claims are barred in whole, or in part, by the doctrines of laches, waiver, estoppel, and/or unclean hands.

(Hatteras Answer, DE # 109, at 28.) This type of bare bones pleading is likely insufficient to give notice of the defense of collateral estoppel being asserted. See Tippman Eng'g, LLC v. Innovative Refrigeration Sys., No. 5:19-cv-87, 2020 U.S. Dist. LEXIS 58148, at *8 (W.D. Va. Apr. 2, 2020) (granting motion to strike defense which alleged only that the claims "are barred by [p]laintiff's unclean hands"). Nonetheless, assuming this defense was properly raised, Hatteras has failed to establish that it is entitled to summary judgment on this issue.

It is well-settled that to establish collateral estoppel, also known as issue preclusion, "a party must show that the issue in question was identical to an issue actually litigated and necessary to the judgment, that the prior action resulted in a final judgment on the merits," and, for defensive use of the doctrine, that "the party seeking to reopen the issue 'had full and fair opportunity to litigate.'" Sartin v. Macik, 535 F.3d 284, 288 (4th Cir. 2008) (quoting Thomas M. McInnis & Assocs., Inc. v. Hall, 349 S.E.2d 552, 560 (N.C. 1986)). To establish the first element, the party invoking estoppel must show: (1) the issue is the same as that in the prior action, (2) the issue was previously raised and *actually litigated*, (3) the issue was material and relevant to the prior action's disposition, and (4) determination of the issue in the prior action was necessary and essential to the judgment. Id. at 288−89 (citation omitted). The party asserting collateral estoppel bears the burden of establishing its predicates and presenting a

23

sufficient record on the issue.  <u>Collins Pond Creek Mining Co.</u>, 468 F.3d 213, 229 (4th Cir. 2006) (citation omitted).

Here, Hatteras contends because a Florida court found the Agreement's forum selection clause was not procured by fraud, its purportedly deceptive acts based on the negotiation of that clause may not be relitigated under Spisso's bad faith or UDTPA claims as alleged in counts 13 and 14.  (<u>See</u> Hatteras Mem. Supp., DE # 123, at 11−12.)  The Florida court ruled:

> So the forum selection clause is valid.  Fraud is not present as a matter of law due to the non-reliance provision.  The non-reliance provision is valid.  There is no evidence of an overwhelming bargaining power by the Defense, in that the Plaintiff and the Defendant were represented by competent counsel.  And there are sufficient ties to North Carolina, which is the forum that is being sought by the Defense, and it appears to be adequate forum for the reasons stated in the papers and on the record.

(Florida Hearing Tr., DE # 117-8, at 13.)

As an "aggravated circumstance[]" in support of his UDTPA and bad faith claims in this lawsuit, Spisso relies on Hatteras's alleged "deception during negotiation of the . . . Agreement." (Second Am. Countercl., DE # 99, at 79−80.)  He also alleges at least fifteen other actions which he contends support his UDTPA claim.  (<u>Id.</u> at 83.)  The Florida court's finding that "[f]raud is not present as a matter of law due to the non-reliance provision" does not demonstrate that Hatteras's alleged deception was actually litigated nor material to the court's ruling that "[t]he non-reliance provision is valid."

Fraud is a separate and distinct claim from bad faith or a violation of the UDTPA.  <u>See</u> <u>Bybee v. Island Haven, Inc.</u>, No. COA17-859, 2018 N.C. App. LEXIS 787, at *15 (N.C. Ct. App. Aug. 7, 2018) (noting UDTPA does not require plaintiff to show fraud or bad faith).

> To prevail on a claim of unfair and deceptive trade practice[s] a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business.  A practice is deceptive if it has the capacity

24

or tendency to deceive the average consumer, *but proof of actual deception is not required. . . . The plaintiff need not show fraud,* bad faith, deliberate acts of deception or actual deception, but must show that the acts had a tendency or capacity to mislead or created the likelihood of deception.

Spartan Leasing Inc. v. Pollard, 400 S.E.2d 476, 482 (N.C. Ct. App. 1991) (internal quotation marks and citations omitted) (emphasis added); see also Cordaro v. Harrington Bank, FSB, 817 S.E.2d 247, 256 (N.C. Ct. App. 2018) (noting the covenant of good faith and fair dealing implies "neither party will do anything which injures the right of the other to receive the benefits of the agreement." (citation omitted)); Robinson v. Deutsche Bank Nat'l Trust Co., No. 5:12-cv-590, 2013 U.S. Dist. LEXIS 50797, at *41 (E.D.N.C. Apr. 9, 2013) (finding plaintiff stated a claim for breach of good faith by alleging defendants provided her false information and allowed a foreclosure to proceed despite telling her it would not). Hatteras has failed to establish that the Florida court necessarily decided that the alleged deception was not "an unfair or deceptive act or practice, or an unfair method of competition." Likewise, Hatteras has failed to establish that the Florida court necessarily decided the alleged false representations did not injure Spisso's rights to receive the benefits of his agreement. Thus, its motion for summary judgment as to counts 13 and 14 (to the extent it relates to Vessel No. 2) on this ground will be denied.

*2. Count 2*

Hatteras seeks partial summary judgment as to count 2 of the Counterclaim. (Hatteras Mem. Supp., DE # 123, at 4.) Count 2, in part, alleges Hatteras breached the Agreement by providing a nonconforming vessel, i.e., Vessel No. 2. (Second Am. Countercl., DE # 99, at 43.) Among the "numerous" nonconformities, Spisso alleges "[u]pon delivery, Vessel No. 2 was not a vessel that could be a 'New Vessel' in 2017 . . . because an act of Hatteras's employee . . . before or during delivery or bailment caused Vessel No. 2 to be a fire-damaged vessel." (Id. at 42–43.) In addition to the fire damage preventing it from being new in 2017,

Spisso contends "Vessel No. 2 was constructed from parts, including engines, that were too old for the vessel to be considered new in 2017 or even in 2016." (Id. at 44).

Hatteras contends the fire occurred after delivery and acceptance and was not the result of a defect in the boat, and thus is unrelated to compliance with the Agreement. (Hatteras Mem. Supp., DE # 123, at 15, 18.) Hatteras further argues Vessel No. 2 was in fact a 2017 model year yacht and thus complied with the terms of the Agreement. (Id. at 18.) Accordingly, Hatteras submits it is entitled to summary judgment on count 2 to the extent it is premised upon a breach of the obligation to provide a 2017 model year yacht. (Hatteras Mem. Supp., DE # 123, at 19.) Spisso argues the fire could have begun before Vessel No. 2 left Hatteras's dock, that he had not yet accepted the vessel at the time of the fire, and that even if he had, he could still hold Hatteras liable for breach of the Agreement because its employee caused the vessel to catch fire. (Spisso Omnibus Mem. Opp'n, DE # 155, at 18–21.)

### a. Nonconformity due to fire

In support of his argument that the fire could have begun before the boat left Hatteras's dock, he offers only the fact that the fire began in the Hatteras employee's tool bag, which was placed in the engine room prior to departure. (Spisso Omnibus Mem. Opp'n, DE # 155, at 18.) He contends the fire "could haven smoldering for days before igniting into the flames that [Hatteras's] employees saw and had to put out." (Id. at 19.) This speculative hypothesis, without any evidentiary support, is insufficient to refute Hatteras's evidence that the fire occurred on 17 September 2016, the day it was observed. (See Rice Depo., DE # 142-2, at 76–77.)

Even if the fire occurred 17 September 2016, Spisso contends he had not accepted delivery of the boat at that time. (See Spisso Omnibus Mem. Opp'n, DE # 155, at 19–20.)

According to Hatteras,

> Spisso had a two-day orientation at Hatteras where he was afforded the opportunity to conduct a thorough inspection of [Vessel No. 2]. He acknowledges signing the Delivery Receipt, which explicitly states: "The undersigned hereby acknowledges receipt and acceptance of the vessel described above." Spisso acknowledged writing his name on the Checklist for Deliveries reflecting final clearance of funding, completion of orientation, and execution of the Delivery Receipt. As further evidence of his acceptance, Spisso signed a "Vessel Acceptance Form" which acknowledges that the vessel has been thoroughly reviewed with the construction manager, and approved by the customer or his designee, that the customer concurs with the factory construction manager that the vessel conformed to their performance and quality expectations.

(Hatteras Mem. Supp., DE # 123, at 16 (internal citations omitted); Hatteras Statement of Facts, DE # 124, ¶¶ 24–34.) Hatteras also contends that Spisso signed the water delivery acknowledgment form, obtained insurance on the Vessel, and transmitted final payment. (Id. at 16–17 (citing Hatteras Statement of Facts, DE # 124, ¶¶ 35–36).) Finally, Hatteras contends "[o]n September 16, 2016, [Spisso] took physical possession of and control over [Vessel No. 2], took it to a marina overnight, and then departed the next morning headed to Fort Lauderdale." (Id. at 17 (citing Hatteras Statement of Facts, DE # 124, ¶ 37).) Spisso admits that he "signed certain documents,"[7] (Spisso Resp. to Hatteras Statement of Facts, DE # 153, ¶ 24), obtained insurance for the boat, (id. ¶ 36), and submitted final payment for it prior to 16 September 2016, (id.).[8] Finally, he admits that he left from Hatteras's facility on Vessel No. 2 on 16 September

---

[7] He clearly acknowledges signing the Delivery Receipt and the Checklist for Deliveries. (Spisso Resp. Opp'n Hatteras Statement of Facts, DE # 153, at 7; Spisso Depo., DE # 146-1, at 14−15.) His deposition testimony seemingly acknowledges signing the Vessel Acceptance Form, (see Spisso Depo., DE # 146-1, at 14−15), but it is not clear that form is the document being discussed. Hatteras represents that docket entry 124-12 is the Vessel Acceptance Form. (Hatteras Statement of Fact, DE # 124, at 9.) Spisso seemingly admits that the signature on page 2 of what Hatteras deems the "Water Delivery Acknowledgment Form" belongs to him. (Spisso Depo., DE # 146-1, at 18−19; see also Water Delivery Acknowledgment Form, DE # 124-13, at 2.) He contests whether that signature page belongs with that document. (Spisso Depo., DE # 146-1, at 18.)

[8] He "dispute[s]" that his signature or handwriting establishes the contents of the documents as facts, including because he did not even read the documents (and is not fluent in English)." (Spisso Resp. to Hatteras Statement of Facts, DE # 153, ¶ 24.) Spisso does not raise this argument in his memoranda.

2016.  (Id. ¶ 37.)  Thus, Hatteras argues, "[t]he totality of these actions unequivocally establish that Spisso accepted [Vessel No. 2]" prior to the fire  (Hatteras Mem. Supp., DE # 123, at 17.)

The parties agree "[a]cceptance occurs when the buyer 'does any act inconsistent with the seller's ownership.'"  (DE # 123, at 15–16 (citing Waterfront Props., Inc. v. Xerox Connect, Inc., No. 3:04-cv-322, 2006 U.S. Dist. LEXIS 7236, at *8 (W.D.N.C. Jan. 31, 2006) (quoting N.C. Gen. Stat. § 25-2-606)); Spisso Omnibus Mem. Opp'n, DE # 155, at 20 (agreeing).)  In arguing he did not accept the vessel, Spisso relies on N.C. Gen. Stat. §§ 25-2-512(2) and 25-2-513(1) as well as case law.  (Spisso Omnibus Mem. Opp'n, DE # 155, at 21).  Spisso also contends Hatteras's employees' presence on Vessel No. 2 was inconsistent with his ownership and an acknowledgment that he had not yet accepted the vessel.  (Id. at 21.)  The court will address these arguments in turn.

First, N.C. Gen. Stat. § 25-2-512(2) provides that "[p]ayment pursuant to subsection (1) does not constitute an acceptance of goods or impair the buyer's right to inspect or any of his remedies."  However, subsection (1) specifically applies "[w]here the contract requires payment before inspection."  N.C. Gen. Stat. § 25-2-512(1).  Spisso cites no record evidence to establish that the Agreement required payment before inspection.  Therefore, his argument that his payment for the vessel does not constitute acceptance, based on that statute, fails.

Next, he cites N.C. Gen. Stat. § 25-2-513(1) for the proposition that conducting inspections and obtaining insurance do not constitute acceptance.  (Spisso Omnibus Resp. Opp'n, DE # 155, at 21.)  It is true that § 25-2-513(1) allows inspection of goods before payment or acceptance, however Hatteras contends Spisso was afforded two days to conduct such inspection during orientation.  (Hatteras Mem. Supp., DE # 123, at 16 (citing Hatteras Statement of Facts, DE # 124, ¶¶ 24–31).)  Spisso does not deny that he attended a two-day orientation, but

28

rather, argues such orientation was not a reasonable opportunity to inspect the boat. (Spisso Omnibus Mem. Opp'n, DE # 155, at 21.) This contention alone is insufficient to create a genuine issue of material fact as to whether he accepted the boat.

Finally, Spisso cites HPS, Inc. v. All Wood Turning Corp. for the proposition that acceptance "is unrelated to the question of passage of title from seller to buyer and is 'only tangentially related to buyer's possession of goods.'" 204 S.E.2d 188, 190 (N.C. 1974) (citation omitted). While this may be true, Spisso did not merely accept title or possession here, he did both, in addition to tendering final payment and signing multiple delivery forms. (See Spisso Resp. to Hatteras Statement of Facts, DE # 153, ¶¶ 24, 36–37.)

Finally, in response to Spisso's contention that the presence of Hatteras's employees on Vessel No. 2 was inconsistent with his ownership and an acknowledgment that he had not accepted the vessel, Hatteras contends "[i]t is a standard practice for Hatteras to offer a service technician to travel with new owners on the first voyage of new yachts as a courtesy service." (Countercl. Defs.' Resp. to Spisso Statement of Facts, DE # 150, at 24.) Aaron Siegel[9] and Baird Paschal, Hatteras employees, testify new owners are free to decline this service and can leave Hatteras's facility without anyone from Hatteras onboard if they choose. (Siegel Depo., DE # 150-10, at 6–7; Paschal Depo., DE # 150-22, at 4–5.) Spisso, without citation, refutes that he could have refused this service. (See Spisso Resp. to Hatteras Statement of Facts, DE # 153, ¶ 39.) This blanket assertion is insufficient to overcome the testimony of two Hatteras employees to the contrary. Thus, Spisso has failed to establish that the presence of the Hatteras employees on the vessel indicates he had not yet accepted it.

---

[9] Spisso contends Siegel lacks personal knowledge of the events of 2016. (Spisso Resp. Opp'n Hatteras Statement of Facts, DE # 153, at 18.)

Spisso's undisputed actions as a whole signify his acceptance of Vessel No. 2. See HPS, 204 S.E.2d at 190 ("'Acceptance is ordinarily signified by language or conduct of the buyer that he will take the goods.'" (citation omitted)). Much like in American Imports, Inc. v. G. E. Employees Western Region Federal Credit Union, the court cannot agree that there is a question as to whether Spisso accepted Vessel No. 2 when he tendered final payment, signed delivery paperwork, accepted title, and took possession of the boat, after being afforded two days to inspect it. 245 S.E.2d 798, 800–01 (N.C. Ct. App. 1978).

Even assuming Spisso had accepted delivery, he argues he was entitled to, and did, revoke acceptance. (Spisso Omnibus Resp. Opp'n, DE # 155, at 22.) Under certain circumstances, a buyer may revoke acceptance of goods when a "nonconformity substantially impairs its value to him." N.C. Gen. Stat. § 25-2-608. Spisso contends the fire damage rendered Vessel No. 2 nonconforming under the Agreement. (See Second Am. Countercl., DE # 99, at 20; Spisso Mem. Supp., DE # 127, at 19–20; Spisso Omnibus Resp. Opp'n, DE # 155, at 22.) However, the parties agree the fire was not the result of a defect with the vessel, but that it originated in the employee's tool bag. (Spisso Statement of Facts, DE # 126, ¶ 65; Countercl. Defs.' Resp. Opp'n Statement of Facts, DE # 150, ¶ 114.) Having found no genuine issue of material fact as to the date of the fire (17 September 2016), and Spisso's acceptance of the vessel prior thereto, the fire could not render the vessel nonconforming under these circumstances. Thus, as to whether the fire itself prevented the vessel from being a "new vessel" and in breach of the Agreement, Hatteras is entitled to summary judgment.

### b. Nonconformity due to parts

Hatteras alleges "the record evidence conclusively establishes that [Vessel No. 2] was constructed from new parts, and was delivered to Spisso as a new 2017 model year vessel as

called for in the contract." (Hatteras Mem. Supp., DE # 123, at 18.) Thus, it contends it is entitled to summary judgment on this issue. According to Hatteras's evidence, it assigns model years based on the delivery date of vessel, with all vessels delivered after June 1 receiving the subsequent year's designation. (Hatteras Statement of Material Facts, DE # 124, ¶ 16; Saloom Decl., DE # 124-8, at 2–3; Fram Depo., DE # 135-1, at 114–15.)[10] It further alleges Spisso was aware the engines for Vessel No. 2 would be ordered in 2015, because he signed off on a production schedule indicating as such. (Hatteras Statement of Material Facts, DE # 124, at 5.) In response, Spisso contends the production schedule specified delivery on 13 May 2016. Thus, he argues, according to its model-number protocol, "Hatteras was planning to supply a *2016* model," which would be in breach of the Agreement. (Spisso Omnibus Mem. Opp'n, DE # 155, at 24 (emphasis in original).) Further, he contends the schedule does not indicate when the engines would be ordered. (Id.) Nonetheless, he argues there was no mutual intent because no evidence suggests he was ever aware of the model-numbering protocol or its engine-ordering practices. (Id.)

"With all contracts, the goal of construction is to arrive at the intent of the parties when the contract was issued." N.C. State Bar v. Merrell, 777 S.E.2d 103, 114 (N.C. Ct. App. 2015) (quoting Bank of Am., N.A. v. Rice, 750 S.E.2d 205, 209 (N.C. Ct. App. 2013)). "[T]he trial court may interpret a plain and unambiguous contract as a matter of law if there are no genuine issues of material fact." Premier, Inc. v. Peterson, 755 S.E.2d 56, 59 (N.C. Ct. App. 2014) (citation omitted). Here, the parties agree the Agreement calls for a 2017-year model yacht. Based on the conflicting evidence, they disagree as to what that means and whether there was

_____

[10] Spisso contends Matt Saloom lacks personal knowledge of the events in September 2016. (Spisso Resp. Opp'n Hatteras Statement of Facts, DE # 153, at 18.) Even so, for purposes of this motion, the court considers Saloom's declaration.

31

mutual agreement between the parties as to that term.  As such, Hatteras has failed to establish

that there is no genuine dispute as to whether it provided a new 2017 year-model yacht in

compliance with the Agreement.  It is not entitled to summary judgment on this ground.

Hatteras's motion for partial summary judgment as to count 2 will be granted in part and

denied in part.  Hatteras is entitled to summary judgment on count 2 to the extent Spisso relies on

damage from the fire itself to establish Vessel No. 2 was not a "new vessel," count 2 may

otherwise proceed.

3.  *Count 6*

Count 6 alleges breach of various implied warranties pertaining to Vessel No. 2.  (See

Second Am. Countercl., DE # 99, at 59.)  Hatteras contends it is entitled to summary judgment

on this count because "it expressly and validly disclaimed any implied warranties."  (Hatteras

Mem. Supp., DE # 123, at 19.)  Hatteras argues its express limited warranty (the "HELW"), (see

Agreement, DE # 128-11, at 10), complied with the provisions of the statutory disclaimer

requirements.  (Id. at 20.)  In response, and setting aside the issue of whether Hatteras effectively

disclaimed any implied warranty, Spisso argues the HELW "applies only to the yacht's first

retail owner."  (Spisso Omnibus Mem. Opp'n, DE # 155, at 28.)

The Agreement provides Vessel No. 2:

> will be subject to Hatteras' standard limited warranty, a current version of which is
> attached to this Agreement as Exhibit B[, the HELW].  Other than Hatteras'
> standard limited warranty, Hatteras makes no, and expressly disclaims all,
> representations or warranties, express or implied, with respect to or relating in any
> way to [Vessel No. 2], including without limitation the implied warranties of
> merchantability and fitness for a particular purpose.

(Agreement, DE # 128-11, at 4.)  The HELW provides "warrant[ies] to the first retail owner of

its 2017 model year yacht."  (Id. at 10).

32

Spisso contends he was never a "retail owner" of Vessel No. 2. (Spisso Omnibus Mem. Opp'n, DE # 155, at 28.) Rather, he claims Hatteras "treated him like a dealer" by negotiating directly with him. (Id. 28–29.) Thus, he argues, the HELW "is a manufacturer's warranty whose terms and conditions flow to the ultimate consumer, or retail owner." (Id. at 29.) It is undisputed that Hatteras negotiated directly with Spisso. (See Fram Depo., DE # 135-1, at 48.) It is likewise undisputed that Hatteras "normally" does not sell yachts directly to the consumer, rather it uses a dealer. (Id. at 114; Penvose Depo., DE # 138-3, at 72−73.) However, because this was a settlement, there was no dealer involved with Vessel No. 2. (Fram Depo., DE # 135-1, at 114.) Yet, Hatteras gave Spisso "a discount of 15 percent off retail for all items, just like a dealer." (Id. 121–22; see also id. at 119.) The inferences drawn from the cited testimony conflict: Hatteras did negotiate directly with Spisso and provided him discounts "just like a dealer," but this was a different process, so there was no dealer involved.

Given the conflicting inferences drawn from the evidence provided, there is a genuine issue of material fact as to whether the HELW, on its face applicable to "the first retail owner," applies to Spisso. Hatteras is not entitled to summary judgment on this count.

### 4. Count 7

Count 7 alleges breach of express written and oral warranties regarding Vessel No. 2. (See Second Am. Countercl., DE # 99, at 65.) It alleges, among other things, that "Hatteras warranted that [] Spisso would not have a negative experience with Vessel No. 2, as he had with Vessel No. 1." (Id.)

Under North Carolina law, a claim for breach of express warranty requires proof of

(1) an express warranty as to a fact or promise relating to the goods, (2) which was relied upon by the plaintiff in making his decision to purchase, (3) and that this express warranty was breached by the defendant.

33

Harbour Point Homeowners' Ass'n v. DJF Enters., (N.C. Ct. App. 2010) (quoting Hall v. T.L. Kemp Jewelry, Inc., 322 S.E.2d 7, 10 (1984)).  Although the seller need not use formal words like "warrant" or "guarantee" to create a warranty, "a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."  N.C. Gen. Stat. § 25-2-313(2).

Hatteras argues there is no record evidence that Hatteras warranted Spisso "would not have a negative experience," and even if so, that is an opinion, which does not amount to an express warranty.[11]  (Id. at 23.)  Spisso argues that Hatteras bears the burden of proving such a statement is not a warranty under these circumstances.  (Spisso Omnibus Mem. Opp'n, DE # 155, at 34.)  Actually, Spisso, as the non-movant, bears the burden of offering admissible evidence to show the express warranty was made and cannot rest solely on an allegation in the Counterclaim.  See Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208 (4th Cir. 2016) (noting the nonmoving party bears the burden of offering admissible evidence to show a genuine issue of material fact and cannot rely solely on allegations in the pleadings).  Spisso has failed to cite to any record evidence that Hatteras made any statement regarding the "experience" he might expect to have with the vessel.  As such, Hatteras is entitled to summary judgment on this issue.

Next, Hatteras contends Spisso did not assert any allegations regarding defects in the "fuel tanks, woodwork, and door and window seals" until the Counterclaim, making them untimely.  (Hatteras Mem. Supp., DE # 123, at 23.)  The court granted Hatteras's motion to strike paragraphs 155, 182, 247, and 264 of the Counterclaim, which concern alleged defects in

---

[11] Hatteras also contends it is entitled to summary judgment on count 7 in part because it delivered a new, 2017 year model vessel.  Thus, it alleges, "for the same reason [c]ount 2 fails to the extent it relies on the alleged failure to deliver a "new vessel, [c]ount 7 also fails."  (Hatteras Mem. Supp., DE # 123, at 22–23.)  For the reasons discussed in section II.C.2.b. above, a genuine issue of material fact exists as to whether Hatteras provided a new, 2017 year model yacht.  Thus, Hatteras is not entitled to summary judgment on count 7 based on this ground.

34

the fuel tanks, woodwork, and door and window seals, (Order, DE # 168), and thus, Spisso cannot rely on any such alleged defects to support his breach of warranty claim. Hatteras is entitled to summary judgment on this issue.

Accordingly, Hatteras will be entitled to summary judgment on count 7 to the extent Spisso relies on an alleged representation that he would not have a bad experience or defects in the fuel tanks, woodwork, and door and window seals, to establish a breach of warranty. Brunswick's motion for summary judgment as to count 7 will otherwise be denied.[12]

*5. Count 12*

Count 12 alleges wrongful arrest and abuse of process. (Second Amended Countercl., DE # 99, at 76.) Spisso claims Hatteras improperly initiated this action and wrongfully caused a lien on and arrest of Vessel No. 2. (Id. 76–77.) Hatteras alleges this count fails because Spisso "cannot demonstrate any abuse of process after the filing of the subject complaint, and further, because the complaint was filed for the precise purpose for which arrest actions are intended." (Hatteras Mem. Supp., DE # 123, at 27.) Specifically, Hatteras contends Spisso's allegations "pertain exclusively to the initiation of the lawsuit," while abuse of process requires exploitation of the process *after* process has issued. (Id. (citing Priority Ambulance, LLC v. Poirier, No. 4:14-cv-00045, 2016 U.S. Dist. LEXIS 176283, at *11 (E.D.N.C. Dec. 21, 2016).)

Abuse of process requires proof of "(1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings." Spirax

---

[12] Hatteras also alleges it is entitled to summary judgment on Spisso's "claim for breach of warranty as to the fire alarm, fire suppression system . . ." because he failed to provide notice as to those claims under the HELW. (Id. at 24.) As to whether Spisso provided requisite notice of his claims for breach regarding the fire alarm and fire suppression system, the court previously found a genuine issue of material fact as to whether the HELW applied to Spisso. (See supra section II.C.3.). Accordingly, the court will not as a matter of law decide whether he complied with its provisions.

Sarco, Inc. v. SSI Eng'g, Inc., 122 F. Supp. 3d 408, 430 (E.D.N.C. 2015) (citing Barnette v. Woody, 88 S.E.2d 223, 227–28 (N.C. 1955)). The North Carolina Supreme Court has explained:

> The ulterior motive requirement is satisfied when the plaintiff alleges that the prior action was initiated by defendant or used by him to achieve a collateral purpose not within the normal scope of the process used. The act requirement is satisfied when the plaintiff alleges that once the prior proceeding was initiated, the defendant committed some wilful [sic] act to use the existence of the proceeding to gain advantage of the plaintiff in respect to some collateral matter.

Stanback v. Stanback, 254 S.E.2d 611, 624 (N.C. 1979) (citations and quotations omitted); see also Spirax, 122 F. Supp. 3d at 430; Pinewood Homes, Inc. v. Harris, 646 S.E.2d 826, 831 (N.C. Ct. App. 2007).

In Hewes v. Wolfe, the court held a complaint alleging malicious filing of a *lis pendens* and notice of lien "for the purpose of injuring and destroying the credit business of the plaintiffs and in general to oppress the plaintiffs[]" were sufficient to state a claim. 330 S.E.2d 16, 19 (N.C. Ct. App. 1985). In Pinewood, defendants obtained a preliminary injunction and in doing so, plaintiff alleged:

> (1) '[d]efendants . . . had an ulterior purpose of coercing plaintiffs to pay a judgment they were not obligated to pay'; (2) defendants 'maliciously refused to recognize the validity' of the trusts; and (3) have therefore gained 'an advantage over the assets' held by plaintiffs.

Pinewood, 616 S.E.2d at 832. The court held these allegations were sufficient to survive a motion to dismiss. Id.

The Counterclaim alleges, in part:

> Among the acts of legal process in which Hatteras and Versa [] have engaged and that are not proper in the regular prosecution of foreclosing a maritime lien are the following: Hatteras's presentation to this Court of an Original Verified Complaint designed to give the Court the impression that Acquaviva owned but simply abandoned [Vessel No. 2] at Hatteras's facilities, forcing Hatteras to supply necessaries to the vessel that it was under no duty to provide. Hatteras represented that a "smoke incident" occurred—failing to reveal that it was an actual fire caused by Hatteras's employee, which Hatteras had acknowledged was an "acute fire."

36

Hatteras represented that [Vessel No. 2] was brought to Hatteras's dock at the request and with the approval of Acquaviva, its owner—failing to reveal that Acquaviva was an intended purchaser that had rejected [Vessel No. 2] after Hatteras damaged it during delivery. Hatteras represented that it offered to repair [Vessel No. 2] "as a gesture of good will"—failing to reveal that Hatteras had caused the damage or that, having damaged the vessel, Hatteras was required to refund Mr. Spisso's payments with interest and was not entitled to opportunities to cure by repairing it. Hatteras included its attorneys' fees as necessaries.

Hatteras sought and obtained an arrest warrant based on an ex parte motion without notice, although Hatteras knew exactly how to reach [] Spisso and their attorneys had been in daily contact.

This conduct caused a wrongful lien, which blemishes the title of [Vessel No. 2], and in connection with which the Counterclaim Plaintiffs have been forced to take steps and expend funds in an effort to clear the title, including attorneys' fees and expenses.

This conduct caused a wrongful arrest, which deprived the Counterclaim Plaintiffs of their property (resulting in loss of use of the property), diminished the property's value, and damaged the property.

(Second Am. Countercl., DE # 99, at 77–78.)  After Spisso appeared in this action, he argues "Hatteras maintained the advantage that it had wrongfully obtained, forcing Mr. Spisso to post a bond to secure the vessel's release," and "has held its wrongfully obtained security interest in Mr. Spisso's vessel for three years now."  (Spisso Omnibus Mem. Opp'n, DE # 155, at 36.)

Here, unlike in Priority Ambulance, Hatteras's allegedly wrong act was not merely initiating an action, but also seeking a wrongful arrest of the vessel, a bond, and a custodian.  Cf., 2016 U.S. Dist. LEXIS 176283, at *11 (finding no abuse where plaintiff allegedly filed the action for an ulterior motive and without investigating).  In Pinewood Homes, the dissent argued the filing of an injunction, alone, was insufficient to state a claim for abuse of process, stating "[d]efendants would have had to take some further affirmative action, in addition to obtaining the injunction, in order to 'gain an advantage over the assets held in trust by plaintiffs.'"  Pinewood Homes, 646 S.E.2d at 837 (Wynn, J. dissenting).  The majority rejected this view,

focusing on the impact of the injunction.  Id. at 832.  Under the circumstances here, the request

for arrest of the vessel and resulting bond are similar to the filing of the lis pendens in Hewes and

the injunction in Pinewood Homes.  These actions, beyond the initiation of the complaint,

allegedly "caused a wrongful lien, which blemishes the title of [Vessel No. 2]."  (Second Am.

Countercl., DE # 99, at 78); see Pinewood Homes, 646 S.E.2d at 836 (discussing the clouded

title resulting from the mere filing of a notice of lis pendens).  Beyond generally denying that

these actions were taken for an improper purpose, Hatteras rests its argument on the alleged lack

of evidence that it "engaged in any actions abusive of the legal process after filing of the

lawsuit."  (Hatteras Mem. Supp., DE # 123, at 28.)  The general denial asserted by Hatteras'

counsel that it commenced this action for the exact purpose it is intended to accomplish is

insufficient to establish that there is no genuine issue of material fact.  Summary judgment on

this issue is inappropriate.

  *6.  Count 15*

  Count 15 alleges Hatteras has been unjustly enriched by Spisso.  (Second Amended

Countercl., DE # 99, at 85.)  Hatteras contends it is entitled to summary judgment on count 15

because that claim is "presumably [based on] money paid to Hatteras for the purchase of the

subject vessels, as there is no other allegation or proof of any other money paid to Hatteras," and

this money was paid "pursuant to contracts for the purchase of both vessels."  (Hatteras Mem.

Supp., DE # 123, at 29.)  Thus, it argues this claim fails because unjust enrichment is not an

appropriate remedy when there is a contract between the parties.  (Id. (citations omitted).)

  In response, Spisso contends he has twice conferred additional benefits on Hatteras,

outside of contract—he was forced to allow a security interest in Vessel No. 2, and forced to

require his insurer to pay for at least $363,016.71 in damage caused by Hatteras.  (Spisso

Omnibus Mem. Opp'n, DE # 155, at 38–39.)  He also alleges he lost work time.  (Id. at 39.)[13]

Even viewing this evidence in the light most favorable to Spisso, he has failed to present

sufficient evidence to create a genuine issue of material fact on this issue.

> Under a claim for unjust enrichment, a plaintiff must establish certain essential
> elements: (1) a measurable benefit was conferred on the defendant, (2) the
> defendant consciously accepted that benefit, and (3) the benefit was not conferred
> officiously or gratuitously.

Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co., 712 S.E.2d 670, 677 (N.C. Ct.

App. 2011) (citation omitted).  "[O]nly in the absence of an express agreement of the parties will

courts impose a quasi contract or a contract implied in law in order to prevent an unjust

enrichment."  Augustson v. Bank of Am., N.A., 864 F. Supp. 2d 422, 438 (E.D.N.C. 2012)

(quoting Whitfield v. Gilchrist, 497 S.E.2d 412, 415 (N.C. 1998)).  Thus, unjust enrichment is an

appropriate remedy only in the absence of an actual agreement.  Id.

There is no dispute that Spisso deposited a bond with the Clerk of this court.  (DE # 11.)

And even accepting as true that he "has been forced to require his insurer to adjust and pay for at

least $363,016.71 in damage caused by Hatteras," (Spisso Omnibus Mem. Opp'n, DE # 155, at

39), and has lost work time, he has failed to establish how either of these actions conferred a

benefit on Hatteras.  While Spisso may conceivably recover, as damages, money spent repairing

the vessel due to the fault of another along with related expenses, he cannot sustain a claim for

unjust enrichment.   Therefore, Hatteras is entitled to judgment on this claim.

---

[13] In support of these arguments, he cites "Pls.' Exh. 59" and "Pls. Exh. 79 at pp. 23."  (Id.)  Assuming "Pls.' Exh. 59" refers to docket entry 134-3, this appears to be an invoice showing $363,016.71 billed.  The court has been unable to locate "Pls. Exh. 79" on the record.

### D. Spisso's Motion for Summary Judgment as to Counts 2, 6, and 7 of the Counterclaim

#### 1. Count 2

Spisso contends he is entitled to summary judgment on count 2 of his Counterclaim because Hatteras breached the Agreement by tendering a nonconforming vessel and then by violating the covenant of good faith and fair dealing when he rightfully rejected or revoked acceptance. (Spisso Mem. Supp., DE # 127, at 19.) Spisso argues "[t]he vessel failed to conform to the parties' agreement in numerous respects," including the fire damage precluded the vessel from being a "New Vessel," the age of the engines prevent it from being considered a "New Vessel" or a 2017 model, and the fire system failed. (Id. at 19–20.)

Counterclaim defendants make arguments comparable to those supporting their individual motions for summary judgment. They contend Spisso's motion as to count 2

> should be denied because 1) with respect to the model year of the vessel, the record evidence establishes that Hatteras delivered and Spisso accepted a 2017 model year vessel as agreed in the . . . Agreement – the fire which occurred after delivery was complete is irrelevant to Hatteras's performance of its contractual obligations; 2) there is no evidence that any of the [c]ounterclaim [d]efendants violated the implied covenant of good faith and fair dealing; and 3) [c]ounterclaim [p]laintiffs rely on provisions of the UCC which are irrelevant to liability for breach of contract, and irrelevant to the facts of this case.

(Countercl. Defs.' Mem. Opp'n, DE # 149, at 5–6.)

#### a. Nonconformity due to fire and parts

As discussed previously, even when viewing the evidence in the light most favorable to Spisso, there is no genuine issue of material fact as to the date of the fire (17 September 2016) and Spisso's acceptance of the vessel prior thereto. Additionally, there is no genuine issue regarding whether the cause of the fire was a result of a defect in the boat—the parties agree, it was not. (See Spisso Statement of Facts, DE # 126, ¶ 65; Countercl. Defs.' Resp. Opp'n

Statement of Facts, DE # 150, ¶ 114.)[14]  As a result, the fire itself could not render the vessel nonconforming.  Spisso is not entitled to summary judgment on count 2 on this basis.

As also discussed above there *is* a genuine issue of material fact as to whether the age of the engines "precluded the vessel from reasonably being considered a 'New Vessel' or a 2017 model."  (Spisso Mem. Supp., DE # 127, at 20.)  Therefore, Spisso is not entitled to summary judgment on count 2 on this ground either.

### b.  Nonconformity due to fire systems

Spisso also contends Vessel No. 2 was nonconforming and therefore in breach of the Agreement because the "fire alarm system failed to alert passengers to the danger, and the fire suppression system failed to operate to smother the fire."  (Spisso Mem. Supp., DE # 127, at 20.)  He contends these nonconformities entitled him to revoke any alleged acceptance, and Hatteras's refusal to provide such UCC remedies also constitutes a material breach of the Agreement.  (Id. at 21–22.)  With regard to the fire suppression system, his expert's report, in part, notes:

> the system canister was placed in a location where the frangible activation bulb, at the top of the canister, was behind the starboard engine and other equipment and tucked into a space between the air conditioning compressors and the ambient air louvers on the starboard side of the engine compartment. For activation to occur a catastrophic fire would have to be present in the engine compartment.

(Godfrey R., DE # 146-5, at 12–18.)  It concludes "[t]he fire suppression system would, in all probability, be ineffective due to the location of the system canister, activation valve and ambient air louvers."  (Id. at 18.)  With regard to functionality, relying on their expert, counterclaim defendants point out, the fire suppression system is not designed to discharge automatically until the temperature sensors detect a certain temperature.  (Gioseffi Decl., DE # 150-17, at 6–7.)

---

[14] Hatteras notes that exhibits 1–79 filed in support of Spisso's motion for summary judgment were not timely filed. (See Hatteras Resp. Opp'n Spisso Statement of Facts, DE # 150, at 2.)  While that appears to be true, and parties are bound to abide by this court's Local Rules, Hatteras does not cite to any resulting prejudice or otherwise suggest the court should not consider the evidence.

41

Thus, "the fire suppression system did not discharge during the engine room fire on Vessel [No.] 2 because the fire was not large enough to generate the heat energy required to trigger automatic discharge, nor did anyone on the vessel operate the manual discharge." (Countercl. Defs.' Mem. Opp'n, DE # 149, at 18 (citing Countercl. Defs.' Resp. to Spisso Statement of Facts, DE # 150, at 14–15, 26–27).) Counterclaim defendants also cite to "the parties' respective experts['] disagree[ment] as to whether there is evidence that the safety pin was properly removed at the time of the incident." (Id. (citing Countercl. Defs.' Resp. to Spisso Statement of Facts, DE # 150, 111).) Finally, counterclaim defendants contend "before [Hatteras's employee] opened the hatch to the engine room, the smoke was contained in that room. When he opened the hatch, some smoke made its way into the salon, at which point the alarms sounded." (Countercl. Defs.' Mem. Opp'n, DE # 149, at 19; Rice Depo., DE # 150-15, at 4.)

The conflicting opinions and testimonies provided demonstrate a genuine issue of material fact as to whether the fire alarm and suppression systems were defective. Therefore, Spisso is not entitled to summary judgment on count 2 based on the alleged defectiveness of the fire system. Having found genuine issues of material fact with regard to Spisso's two remaining purported grounds for rejection/revocation—that the vessel was not new because it was fire damaged and/or contained old engines—he cannot establish he was entitled to UCC remedies at this juncture. Therefore, he has not established that Hatteras's refusal to provide his UCC remedies or take back the vessel constitutes a material breach of the Agreement or breach of the covenant of good faith and fair dealing.

Spisso's motion for summary judgment as to count 2 will be denied.

## 2. Counts 6 and 7

Counts 6 and 7 allege breach of implied and express warranties relating to Vessel No. 2. (See Second Amended Countercl., DE # 99, at 59, 65.)  Spisso seeks summary judgment on these counts contending Hatteras did not successfully disclaim any warranty, and in fact, breached the UCC's implied and express warranties.  (Spisso Mem. Supp., DE # 127, at 25, 27.)

With regard to Hatteras's alleged disclaimer contained in the HELW, Spisso contends it does not apply to him, (id. at 27); the attempted disclaimers therein "fail with respect to its warranting the vessel as a new 2017 model with clean, high-quality interiors," (id. at 28); and even assuming those two contentions to be false, the HELW fails in light of Hatteras's subsequent promises, (id. at 29).  Thus, he alleges counterclaim defendants owed him a warranty of merchantability, fitness for ordinary purposes, fitness for a particular purpose, as well as express warranties "that the vessel would be a 2017 model year 'New Vessel' and that its 'interior standards' would be 'as described and represented during the 2015 Miami Boat Show.'" (Id. at 27.)  He contends "[c]ounterclaim [d]efendants breached all of these implied and express warranties by supplying, in 2016, a vessel that had sustained fire and smoke damage, whose engines had been manufactured in February 2014, and whose fire system failed to operate during a fire."  (Spisso Reply, DE #181, at 10.)

Having found above a genuine issue of material fact as to whether the HELW applied to Spisso, (see supra section II.C.3), Spisso is not entitled to summary judgment as to count 6 or 7 based on his argument that the HELW did not apply to him.[15]  This finding likewise forecloses further discussion of counterclaim defendants' argument—reasserted here—that Spisso may not recover for breach of warranties because he failed to properly submit a warranty claim.

---

[15] An issue of fact as to whether the warranties applied obviates the need to discuss whether they were breached. This is also true of Spisso's claim that Hatteras breached the implied warranty of fitness for a particular purpose.

Assuming the HELW *does* apply to him, Spisso argues, the disclaimers fail with regard to Hatteras's warranties that the vessel was "a new 2017 model with clean, high-quality interiors." (Spisso Mem. Supp., DE # 127, at 28.) The court need not consider the sufficiency of the disclaimer unless there is no genuine issue of material fact as to whether these alleged breaches occurred. As discussed in section II.C.2.b. above, and again when viewing the evidence in the light most favorable to Spisso, the court found a genuine issue of material fact as to whether the boat was a new 2017 model. Likewise, when viewing the evidence in the light most favorable to counterclaim defendants for purposes of this motion, Spisso has failed to establish the absence of a material fact regarding whether the interior sections complied with Hatteras's alleged warranty. Thus, while the parties agree "the basic obligation created by a description of goods cannot be retracted" and "a clause generally disclaiming all warranties, express or implied cannot reduce the seller's obligation with respect to such description," an issue of fact remains as to whether Hatteras breached the description.[16] (See Spisso Mem. Supp., DE # 127, at 28-29; Countercl. Defs.' Mem. Opp'n, DE # 149, at 23 (both quoting Muther-Ballenger v. Griffin Electronic Consultants, Inc., 397 S.E.2d 247, 249 (N.C. Ct. App. 1990) (quoting Comment, N.C. Gen. Stat. § 25-2-313 (1986)))). Accordingly, the court cannot conclude he is entitled to summary judgment on count 6 or 7 on this basis.

Spisso's motion for summary judgment as to counts 6 and 7 will be denied.

---

[16] The same is true of Spisso's argument that many of these representations were made after the Agreement was signed and thus negated the HELW—because there is an issue of fact as to whether these breaches occurred the court cannot grant summary judgment in his favor on this ground either.

### E. Acquaviva's Motion for Summary Judgment on Hatteras's Complaint

#### 1. Subject Matter Jurisdiction

Acquaviva first contends this court lacks subject matter jurisdiction over Hatteras's complaint because "[t]he only contract between Acquaviva and Hatteras was for the manufacture of a vessel," (Acquaviva Mem. Supp., DE # 130-1, at 16), and "a contract for the construction of a vessel does not invoke the subject matter jurisdiction of the federal courts," id. (quoting Hatteras of Lauderdale, Inc. v. Gemini Lady, 853 F.2d 848, 849 (11th Cir. 1988)). Its arguments made in support of this contention are substantially similar to those made in its motion to dismiss, (see Acquaviva Mot. Dismiss, DE # 24, at 9−13), which the court denied, (Order, DE # 29, at 3–4). In response, Hatteras contends its complaint regards the provision of necessaries which was not part of the shipbuilding process or related to the Agreement. (Hatteras Mem. Opp'n, DE # 171, at 4.)

> Admiralty jurisdiction exists over contract disputes if the contract at issue is a maritime contract; whether a contract qualifies as a maritime contract 'depends upon the nature and character of the contract, *and the true criterion is whether it has reference to maritime service or maritime transactions*.'

Barna Conshipping, S.L. v. 2,000 Metric Tons of Abandoned Steel, 410 F. App'x 716, 722 (4th Cir. 2010) (emphasis added); see also 1 Benedict on Admiralty § 182 (2020) ("To be considered maritime, there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry . . . ." (citations omitted)). It is well-settled that a contract to sell or construct a vessel does not invoke federal admiralty jurisdiction. Gemini Lady, 853 F.2d at 849; Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, etc., 625 F.2d 44, 47 (5th Cir. 1980). Yet, one for repairs does. South Carolina State Ports Auth. v. Silver Anchor, S.A., 23 F.3d 842, 846 n.3; Gemini Lady, 853 F.2d at 849. Comparably, "[w]harfage and dockage have consistently been

recognized by the courts as being 'necessary' to the operation of a vessel and therefore maritime in nature and capable of lien status." South Carolina State Ports Auth. v. M/V Tyson Lykes ex rel. Delaware Bay, 837 F. Supp. 1357, 1365 (D.S.C. 1993); see also Sisson v. Ruby, 497 U.S. 358, 367 (1990) ("Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' . . . . Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity."); Silver Anchor, 23 F.3d at 844 (listing "crane rental, cargo handling and storage, wharfage, and dockage" as examples of "maritime services"); Humphreys R., Inc. v. F/V Nils S, 603 F. Supp. 95, 98 (E.D. Va. 1984) ("Wharfage contracts are within the maritime jurisdiction of this Court.").  Even so, courts have long acknowledged "there are few 'clean lines between maritime and nonmaritime contracts.'" Hartford Fire Ins. Co. v. Harborview Marina & Yacht Club Cmty. Ass'n, No. PJM 16-769, 2016 U.S. Dist. LEXIS 170438, at *8 (D. Md. Dec. 9, 2016) (quoting Norfolk Southern Ry. v. James N. Kirby, Pty Ltd., 543 U.S. 14 (2004)).

Hatteras's complaint seeks recovery for "necessaries, including dockage, electrical power, line handling and associated inspections, washing, and transportation expenses, including Captains' fees," it incurred after Vessel No. 2 was left at its dock following the fire onboard the vessel.  (Compl., DE # 1, at 3.)  These services are directly linked to "the operation of the ship, its navigation, or its management afloat" and constitute "maritime services."  See 1 Benedict on Admiralty § 182; see also Sisson, 497 U.S. at 367; South Carolina State Ports Auth., 837 F. Supp. at 1365; Humphreys, 603 F. Supp. at 98; Silver Anchor, 23 F.3d at 844  Thus, the alleged contract—express or implied—for provision of these services falls within this court's admiralty jurisdiction.  See Barna Conshipping, 410 F. App'x at 722 ("Admiralty courts have jurisdiction over quasi-contractual claims that 'arise out of maritime contracts or other inherently maritime

46

transactions.'" (quoting Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc., 553 F.2d 830, 835 (2d Cir. 1977)).

Acquaviva's argument that Hatteras's claim for necessaries cannot lie in admiralty because it allegedly arose from the Agreement between the parties is unavailing. These services were not provided pursuant to the Agreement nor does any obligation to pay for them arise therefrom. The services do not relate to the vessel's manufacturing, but to her storage, maintenance, and upkeep. The services were also provided after the vessel was in the water and had begun its maiden voyage.

Gemini Lady, relied upon by Acquaviva, is distinguishable. There, the buyer contracted for the purchase of a Hatteras yacht, the "Gemini Lady," in January 1985. Gemini Lady, 853 F.2d at 848. "As a part of this sales contract a substantial amount of customization was to be made to the Gemini Lady prior to delivery." Id. at 849. An allowance of $70,000 was included in the purchase price to cover these customizations. Id. In June 1985, the Gemini Lady was delivered to the buyer, with a bill for customizations made beyond the original $70,000. Id. Hatteras contended the additional customization was agreed to orally; American disputed that and refused to pay the bill. Id. Hatteras then filed suit in admiralty seeking to recover for "certain repairs, improvements, or modifications" to the vessel. Id. The Eleventh Circuit held the buyer's intent in the purchase agreement was for the vessel to be customized according to its specifications, thus "all of the work was completed as a part of the sale and/or construction of a new vessel." Id. at 851. Irrespective of whether the buyer subsequently agreed to extend the budget for customizations, it was clear that customizations were ordered in the original contract and were completed prior to delivery of the vessel. See id. at 849. Therefore, Hatteras's attempt

to relabel this work as "repairs" was soundly rejected, and the court lacked admiralty jurisdiction.

Here, the services provided for were not contemplated by or included in the original contract. For these reasons, the court has jurisdiction over this maritime transaction, and Acquaviva is not entitled to summary judgment on this ground.

    *2. Maritime Lien*

Hatteras's complaint seeks enforcement of a maritime lien. "A maritime lien is '[a] lien on a vessel, given to secure the claim of a creditor who provided maritime services to the vessel[.]'" World Fuel Servs. Trading v. Hebei Prince Shipping Co., 783 F.3d 507, 509 (4th Cir. 2015) (quoting Black's Law Dictionary 1065 (10th ed. 2014)). In 1910, Congress enacted the Federal Maritime Lien Act ("FMLA") which modified common law principles governing when a maritime lien arises. Id. at 509–10 (citation omitted). Recently, "the FMLA was recodified as part of the Commercial Instruments and Maritime Liens Act, 46 U.S.C. §§ 31301-31343." Id. at 510. Despite the recodifications, the underlying purpose of the FMLA remains unchanged and the court will refer to the relevant statutes as such. Id. (citing Triton Marine Fuels Ltd., S.A. v. M/V Pacific Chukotka, 575 F.3d 409, (4th Cir. 2009)).

Acquaviva contends Hatteras cannot establish a single element of a FMLA lien. Title 46, Section 31342 of the United States Code provides:

> a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
> > (1) has a maritime lien on the vessel;
> > (2) may bring a civil action in rem to enforce the lien; and
> > (3) is not required to allege or prove in the action that credit was given to the vessel.

Acquaviva first argues Hatteras's claim fails "[b]ecause this is not a maritime contract, [it] cannot possess or enforce a maritime lien." (Acquaviva Mem. Supp., DE # 130-1, at 19.) For

the reasons stated above, the court finds the alleged contract regarding the provision of necessaries as alleged here is a maritime transaction. See SPM Mgmt. LLC v. Motor Yacht Sea Ayre V, 756 F. App'x 304, 306 (4th Cir. 2018) (explaining a maritime lien may arise on an implied wharfage contract). To the extent Acquaviva argues there can be no lien because there was no express "contract," that argument is addressed in section II.E.2.b. below.

### a. Necessaries to the vessel

Acquaviva contends Hatteras did not provide "necessaries" to Vessel No. 2. (Acquaviva Mem. Supp., DE # 130-1, at 23–24.) It argues the provision of dockage, power, line handling, inspections, washing, transportation, and Captains' fees was not necessary to the vessel's mission because the vessel was not being used for its purpose as a pleasure boat at the time the services were provided. (Id. at 25.) Thus, it contends these services do not conform to the statutory definition of necessities. This argument is without merit.

"Necessaries" "includes repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). This definition has been liberally construed to include "goods and services 'reasonably needed in the ship's business, such as [those] that are useful to the vessel, keep her out of danger, and enable her to perform her particular function.'" Triton Marine Fuels, Ltd. v. M/V Pac. Chukotka, 671 F. Supp. 2d 753, 759 (D. Md. 2009) (quoting Bradford Marine, Inc. v. M/V "Sea Falcon", 64 F.3d 585, 589 (11th Cir. 1995)). The services Hatteras alleges as necessaries are the type necessary to keep the vessel out of danger and in working order and thus are consistent with the statutory definition and supporting case law.[17] See, e.g., SPM Mgmt., 756 F. App'x at 306 (upholding maritime lien for implied dockage contract); South Carolina State Ports Auth., 837 F. Supp. at 1365 (finding wharfage, dockage,

---

[17] Hatteras concedes for purposes of this motion that attorneys' fees are not "necessaries." (Hatteras Mem. Opp'n, DE # 171, at 7 n.2.)

harbor master fees, and labor charges "necessary" to the operation of a vessel and capable of lien status).

### b.  Order of the owner or person authorized by the owner

Acquaviva also contends neither it nor Spisso ordered or authorized the provision of necessaries.  (Acquaviva Mem. Supp., DE # 130-1, at 23.)  In fact, it contends it did not own the vessel at time, and therefore *could not* authorize necessaries.  (Id.)  Acquaviva contends it was not the owner, because delivery was incomplete.  This issue is addressed above, see supra section II.C.2.a., and rejected.

Acquaviva's more compelling argument is that it rejected or revoked acceptance of the vessel and therefore, under N.C. Gen. Stat. § 25-2-401(4), title reverted to Hatteras.   (Id. at 23.)  North Carolina General Statute § 25-2-401(4) provides:

> A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a 'sale.'

N.C. Gen. Stat. § 25-2-401(4).  Acquaviva contends Spisso rejected, or revoked his acceptance, of the vessel by stating "take it back."  (Acquaviva Mem. Supp., DE # 130-1, at 9, 23; see also Spisso Depo., DE # 146-1, at 83−84.)  Hatteras asserts this is belied by the evidence.  It contends "take it back" was not a clear rejection or revocation, (see Paschal Tr., DE # 138-2, at 57–58 (testifying "take it back" can mean two things and that he understood Spisso to mean "take it back to New Bern to be repaired")), and that Spisso's maintaining title and insurance as well as taking physical possession of Vessel No. 2 reflect his purported ownership, (Hatteras Mem. Opp'n, DE # 171, at 13).  Finally, Hatteras contends "Acquaviva and Spisso have also repeatedly asserted in correspondence and pleadings that they own [Vessel No. 2]."  (Hatteras Mem. Opp'n, DE # 171, at 13; see, e.g., Email, DE # 172-11, at 2.)  The parties' conflicting evidence on

whether Spisso justifiably revoked acceptance (and therefore could not authorize necessaries) is sufficient to create a genuine issue of material fact. Therefore, Acquaviva is not entitled to summary judgment on these arguments.

Acquaviva also contends, even if it owned the boat, it never ordered Hatteras to provide necessaries and repeatedly refused authorization to work on the boat. (Acquaviva Mem. Supp., DE # 130-1, at 19.) Its position that no order for necessaries can be implied is misplaced. See SGM Mgmt., 756 F. App'x at 306 ("[W]hen the wharf is used without any . . . agreement, the contract is implied, and the proprietor is entitled to recover what is just and reasonable for the use of his property and the benefit conferred."); Humphreys, 603 F. Supp. at 98 (implying a contract for necessaries after expressly finding the absence of a contract between the parties); Port Royal Seafood, Inc. v. M/V Lacye Bryn, No. 2:07-1633-PMD, 2009 U.S. Dist. LEXIS 16302, at *8 (D.S.C. Feb. 25, 2009) (imposing maritime lien where the vessel owner knew dockage was not being provided gratuitously). Thus, even if Spisso did not directly order the provision of necessaries, the law may allow imposition of liability for them. Acquaviva is not entitled to summary judgment on this ground.

### c. Equities

Acquaviva claims it is entitled to summary judgment because the FMLA only applies where the supplier of necessaries needs protection. (Acquaviva Mem. Supp., DE # 130-1, at 26.) It alleges Hatteras owed it at least $56,500 for fire damage to the vessel. (Id.) Therefore, it contends it needed protection and Hatteras is not entitled to maritime lien. Even assuming this contention is legally correct, it is factually disputed. (See Hatteras Mem. Opp'n, DE # 171, at 14 (noting "Hatteras has not admitted to liability for the damages Acquaviva alleges resulted from

the fire").[18]  Further, Hatteras alleges when Spisso removed the vessel from Hatteras's dock in February 2017, it in fact did need the protection of a maritime lien.  See ING Bank N.V. v. M/V Temara, 892 F.3d 511, 519 (2nd Cir. 2018) ("The primary purpose of maritime liens is to facilitate maritime commerce by reducing the counterparty risk associated with supplying a vessel that may not return to the same port again.").  Thus, Acquaviva is not entitled to summary judgment on this ground.

### 3.  Due Process

Finally, Acquaviva argues Hatteras's lien and arrest of Vessel No. 2 were improper due to a lack of notice.  (Acquaviva Mem. Supp., DE # 130-1, at 28.)  From the outset, the court notes that in issuing the warrant, it already "[found] as a fact that the conditions for arrest and/or attachment appear[ed] to exist."  (See Order, DE # 7, at 1.)  Rule C of the Federal Rules of Civil Procedure Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture provides:

> (4) Notice. No notice other than execution of process is required when the property that is the subject of the action has been released under Rule E(5).

Fed. R. Civ. P. Supplemental Rule C(4).  Rule E(4) governs execution of process.  It provides:

> (a) In General. Upon issuance and delivery of the process, or, in the case of summons with process of attachment and garnishment, when it appears that the defendant cannot be found within the district, the marshal or other person or organization having a warrant shall forthwith execute the process in accordance with this subdivision (4), making due and prompt return.

Fed. R. Civ. P. Supplemental Rule E(4).  The court's local rules further provide:

> A defendant is considered to be 'not found within the district' if, in an action in personam, service upon the defendant cannot be effected in person or upon an authorized officer or agent within the State of North Carolina or if the only effective service is through the Secretary of State, the North Carolina Long Arm Statute, or through any method of substituted service.

---

[18] Although this is an unverified statement of counsel, Acquaviva did not present factual evidence that Hatteras admitted liability.

E.D.N.C. Local Admiralty Rule B.1 (2017).  The processes outlined above were followed here.  (See Hogewood Decl., DE # 1-3 (swearing to unsuccessful efforts to find and serve Acquaviva in this district); Order, DE # 7, at 1 (finding conditions for arrest and/or attachment present); Stipulation and Order of Bond, DE # 11 (providing for special bond and release of vessel in accordance with Rule E(5)).)

Additionally, the Fourth Circuit has expressly held "a pre-arrest hearing need not be afforded the shipowner for the same reasons . . . that he [is] not constitutionally entitled to pre-arrest notice." Amstar Crop. v. S/S Alexandros T., 664 F.2d 904, 912 (4th Cir. 1981).  Other circuits have agreed.  See, e.g., Neapolitan Navigation, Ltd. v. Tracor Marine, Inc., 777 F.2d 1427, 1430 (11th Cir. 1985) ("due process does not require that an owner be given notice or a hearing prior to the attachment of his vessel").  Acquaviva's argument on this ground fails.

Accordingly, Acquaviva is not entitled to summary judgment on Hatteras's complaint.

### III. CONCLUSION

For the reasons stated herein Brunswick's motion for summary judgment, (DE # 116), is GRANTED, and Brunswick is DISMISSED from this action.

Versa's motion for summary judgment, (DE # 119), is GRANTED IN PART and DENIED IN PART.  Counts 2, 8–13, and 14 (to the extent it relates to Vessel No. 2) against Versa remain and may proceed under principles of agency only.

Hatteras's motion for summary judgment, (DE # 122), is GRANTED IN PART and DENIED IN PART.  Counts 2, 6–7, and 8–14 remain against Hatteras.  Count 2 may proceed against Hatteras except to the extent it relies on whether the fire itself prevented Vessel No. 2 from being a "new vessel."  Count 7 may proceed against Hatteras except to the extent it relies on an alleged representation that he would not have a bad experience, or defects in the fuel tanks,

woodwork, and door and window seals, to establish a breach of warranty. Count 14 may proceed against Hatteras to the extent it relates to Vessel No. 2.

Spisso's motion for summary judgment, (DE # 125), on counts 2, 6, and 7 of his second amended counterclaim is DENIED.

Acquaviva's motion for summary judgment, (DE # 130-1), on the complaint is DENIED.

The Clerk is DIRECTED to schedule the final pretrial conference no earlier than 45 days from the date this order is filed. The trial date will be set by separate order.

This 28 September 2020.

_____

W. Earl Britt
Senior U.S. District Judge