IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:17-cv-00025-BR

| | |
|---|---|
| HATTERAS/CABO YACHTS, LLC, a foreign limited liability company, Plaintiff, M/Y EPIC (Official Number 747618, HIN: US-HATHR3021617), her engines, boilers, tackle, apparel etc., *in rem*, Defendant, and ACQUAVIVA LTD., a foreign company, and DANIEL SPISSO, Counterclaim Plaintiff, v. HATTERAS/CABO YACHTS, LLC, a Delaware limited liability company, VERSA CAPITAL MANAGEMENT, LLC and BRUNSWICK CORPORATION, Counterclaim Defendants. | ORDER |

Hatteras/Cabo Yachts, LLC ("Hatteras") instituted this action to recover for necessaries provided to the vessel M/Y Epic. Acquaviva Ltd. ("Acquaviva") and Daniel Spisso ("Spisso") counterclaimed, joining Versa Capital Management, LLC ("Versa") and Brunswick Corporation ("Brunswick") and alleging breach of contract and related warranty claims, as well as conversion, bad faith, negligence, and unfair and deceptive trade practices claims.

On 28 September 2020, the court ruled on the parties' cross motions for summary judgment. The court granted Brunswick's motion for summary judgment and dismissed it from this action. The

court denied Acquaviva's motion for summary judgment on the original complaint, leaving Hatteras's claim for breach of maritime contract arising out of its provision of maritime necessaries for trial. The court granted Hatteras's motion for summary judgment in part, leaving Spisso and Acquaviva's claims for breach of contract and related warranties, violation of the Magnuson Moss Warranty Act, negligence, conversion, bad faith, and unfair and deceptive trade practices for trial, ruling: (1) breach of contract may not be premised on an argument that the engine room fire prevented the Epic from being a "new vessel"; (2) breach of express warranty may not be premised on an argument that Hatteras promised Spisso that he would not have a "bad experience" with the Epic, nor may it be premised on evidence of defects in the fuel tanks, woodwork, and door and window seals; and (3) the unfair and deceptive trade practices claim may only proceed as to the Epic. The court also granted Versa's motion for summary judgment in part, leaving Spisso and Acquaviva's claims for breach of contract, violation of the Magnuson Moss Warranty Act, negligence, conversion, bad faith, and unfair and deceptive trade practices (limited to the Epic), for trial on a theory of agency only.

A non-jury trial was conducted before the undersigned beginning on Wednesday, 9 June 2021 and concluding on Monday, 14 June 2021. Based on the credible evidence presented during the trial, the court makes the following:

## I. **FINDINGS OF FACT**

### A. **The Parties**

1. Plaintiff/counterclaim defendant Hatteras is a Delaware Limited Liability Company with its principal place of business in New Bern, North Carolina.

2. The defendant in rem, M/Y Epic, is a 70MY model yacht bearing serial number 70MY302 and Hull Identification Number HATHR3021617.

3. Defendant/counterclaim plaintiff Acquaviva is a British Virgin Islands company and is the current legal owner of the Epic.

4. Counterclaim plaintiff Spisso is a natural person and a citizen of Venezuela.

5. Counterclaim defendant Versa is a Delaware Limited Liability Company.

**B. The Settlement and Release Agreement**

8. On 8 April 2015, Hatteras and Spisso entered into a Settlement and Release Agreement (the "Agreement") to resolve a lawsuit filed by Spisso with respect to a yacht he purchased in 2013. That Agreement also constitutes the written contract for the construction and sale of the Epic.

9. Hatteras and Spisso negotiated the Agreement, through and with the assistance of legal counsel. (See 6/9/21 Tr., DE # 264, at 85–86, 89–90.)

10. Acquaviva was not a party to the Agreement. The Epic was sold to Spisso and then put in Acquaviva's name after delivery. (6/9/21 Tr., DE # 264, at 103.)

11. The Agreement provided, in part, that it was governed by the laws of North Carolina and that venue for any dispute arising out of the Agreement was North Carolina. (Pl.'s Ex. 8.)

12. The Agreement provided that "Hatteras shall build and sell to Buyer, and Buyer shall purchase from Hatteras, a 2017 model year 70MY vessel . . . ." (Id. at 1.) It also required Spisso to transfer clear title to the yacht he purchased in 2013 back to Hatteras and to provide a $700,000 contribution payment toward the new, larger yacht. (Id. at 2.)

13. The Agreement further stated that the vessel would be manufactured in accordance with the specifications detailed on Exhibit A to the Agreement and any change orders. (Id. at 2–3.)

14. The Agreement also provided that the new yacht would be covered by Hatteras's Express Limited Warranty ("HELW"), attached to the Agreement as Exhibit B. (Id.;

Pl.'s Ex. 10.) Spisso initialed all pages of the Agreement, including the HELW. (See 6/9/21 Tr., DE # 264, at 85–86.)

15. The sole remedy under the HELW is "the remedy of repair or replacement of parts or materials that are found to be defective in factory materials or workmanship." (Pl.'s Ex. 10, at 1.)

16. The disclaimer of implied warranties is in all capital letters as opposed to the other text of the document, which is almost entirely in standard, sentence case. Furthermore, the HELW is only two pages long. (Id.)

17. The Agreement itself also included a warranty disclaimer, which stated:

> Other than Hatteras' standard limited warranty, Hatteras makes no, and expressly disclaims all, representations or warranties. express or implied, with respect to or relating in any way to the New Vessel, including without limitation the implied warranties of merchantability and fitness for a particular purpose.

(Pl.'s Ex. 8, at 3.)

18. In order to obtain warranty service, the HELW required the owner to contact an authorized Hatteras dealership within the applicable warranty period. (Pl.'s Ex. 10.) It required the owner to make an appointment with the Hatteras dealer, who would then obtain authorization for repairs to the vessel. (Id.) The HELW also provided an address and phone number for whom to contact in the event of a warranty-related issue. (Id.)

19. The Agreement was signed by Mike Fram, then acting Chief Financial Officer of Hatteras, and Spisso. (6/14/21 Tr., DE # 267, at 70; 6/9/21, DE # 264, at 87–88.)

20. Versa did not authorize Hatteras to act on its behalf in negotiating or executing the Agreement. Versa was not a party to the Agreement, or any other contracts for yacht construction, nor did it control the way in which Hatteras constructed yachts. (See 6/14/21 Tr., DE # 267, at 69–70.)

4

21. Spisso transferred title and ownership of the yacht he purchased in 2013 back to Hatteras pursuant to the Agreement. (6/9/21 Tr., DE # 264, at 51.)

22. Spisso is not a yacht broker or retailer. He purchased the Epic for personal pleasure use only. (6/9/21 Tr., DE # 264, at 102–04.)

23. The delivery date of the Epic was specified in the Agreement as 30 June 2016. (Pl.'s Ex. 8, at 2.)

## C. Construction and Delivery of the Epic

24. Hatteras provided Spisso with a letter enclosing the proposed production schedule and reflecting when the various stages of construction would occur. Spisso signed a copy of the production schedule, which reflected that the engines would be ordered/installed in October 2015. (See Pl.'s Ex. 205-02, 205-04.)

25. Hatteras's purchase order for the engines establishes that the Epic's engines were ordered from Caterpillar on 13 October 2015, in accordance with the production schedule. (Pl.'s Ex. 164, at 2–3.) Spisso understood the engines are installed in the first stage of construction. (6/9/21 Tr., DE # 264, at 98.)

26. The agreed vessel specifications called for CAT C-32A1800 BHP engines to be installed. (6/9/21 Tr., DE # 264, 48–49.) However, Spisso later opted to downgrade the engines to 1600 BHP. (Id.)

27. The Agreement specifically stated:

> In addition, manufacture of the New Vessel may require Buyer to make certain design decisions. If Buyer fails to make such a decision within ten days after Hatteras requests Buyer to do so in writing, Buyer acknowledges that Hatteras may not be able to deliver the New Vessel to Buyer on the Delivery Date. Accordingly, Buyer hereby fully releases and discharges Hatteras from any liability or claims arising from Hatteras' delivery of the New Vessel after the Delivery Date either due to a Change Order specifying a delayed delivery date or the failure of Buyer to make a design decision within ten days of Hatteras' written request to Buyer.

5

(Pl.'s Ex. 8.)

28. Hatteras delivered the Epic to Spisso in a 2-day inspection and orientation conducted on 15 and 16 September 2016. (6/9/21 Tr., DE # 264, at 135.)

29. Hatteras designates model years based on the delivery date of the new vessel. Vessels delivered after June 1 of any given year are given the subsequent year's model year. (DE # 189, at 31.) The Agreement provided for delivery after 1 June 2016, which in fact occurred, so the Epic was a 2017 model year yacht.

30. This model year designation is reflected in the vessel hull identification number and in the Bill of Sale. (Pl.'s Ex. 77, 80.)

31. As of the date of trial, Spisso had the Epic listed for sale as a 2017 model vessel.[1] (Pl.'s Ex. 298.)

32. The installed engines were Caterpillar-manufactured C32 Acert engines that were new from Hatteras's Caterpillar dealer. (See 6/10/21 Tr., DE # 265, at 143; 6/14/21 Tr., DE # 267, at 41.)

33. When the Epic was delivered to Spisso, the port engine had 24 hours of use, and the starboard engine had 23 hours of use. (6/9/21 Tr., DE # 264, at 101.) The engines were new at the time of delivery and were accompanied by new engine limited warranties which went into effect at delivery on 16 September 2016. (See 6/10/21 Tr., DE # 265, at 143, 181; 6/11/21 Tr., DE # 266, at 88.)

34. On the date of delivery, Spisso executed a delivery receipt, Hatteras checklist for

[1] At trial, Hatteras moved for sanctions under Federal Rule of Civil Procedure 37, contending it first learned Spisso had listed the vessel for sale at trial, despite requesting such information in discovery. (6/11/21 Tr., DE # 266, at 6–7.) Hatteras requested that the listing agreement be admitted, which the court allowed, and also requested a presumption that the vessel was a new 2017-year model at the time of delivery. (Id. at 6.) As below, the court has concluded such is the case and the presumption is thus, unnecessary. The motion for sanctions will be denied.

deliveries, Hatteras vessel description, Hatteras water delivery acknowledgement, and product registration. Spisso made his final payment and took title to and possession of the Epic.

**D. The Fire on the Epic**

35. On 16 September 2016, the Epic departed the Hatteras factory in New Bern, North Carolina.

36. The night of 16 September 2016, the Epic docked on the North Carolina coast, then departed early the morning of 17 September 2016. On board were Spisso and his guests: his brother, Salvador Spisso, Oscar Sanchez, and Oleg Fortner; Hatteras employees Chris Rice and Geney Menendez; and Captain Danny Acosta.

37. Rice was working in his capacity as a Hatteras employee onboard the Epic.

38. Shortly after getting underway, Rice noticed a change in the "tone of the engines." (6/14/21 Tr., DE # 267, at 27.) After checking the gauges at the helm, he went to the engine room to investigate. (Id. at 28.) When he opened the engine room door, the room was "full of smoke" and he observed "a little flash across the floor of the deck." (Id.)

39. Rice shouted for the Captain to "pull back the engines," grabbed a handheld fire extinguisher, and extinguished the flames. (Id.) The Captain pulled back or stopped the engines at that time. (Id. at 29.)

40. The fire originated inside the tool bag belonging to Rice, (DE # 210, at 4), which was located in the engine room.

41. The fire was not caused by any alleged defect in the vessel itself.

42. While working as a delivery technician, it was Rice's normal practice to bring a tool bag onboard.

43. The tool bag contained items such as pliers, drill bits, plumbing epoxy, putty, and a butane lighter, which may be used in the repair and maintenance of vessels like the Epic. (6/14/21 Tr., DE # 267, at 25–26.)

44. The butane lighter was contained within an interior pocket of the bag, unable to contact any other items. (Id. at 35–36.)

45. Rice was transporting the butane lighter for his own use and not in commerce.

46. The contents of his tool bag on the day of the fire were common tools and materials used by service technicians generally and by Rice specifically. Rice had utilized the same or similar tool bag, containing the same or similar contents, on yachts for years prior to the subject fire without any fires or other adverse incidents.

47. Spisso was sleeping in the living room when his brother woke him up and told him there was a fire on the boat. During the fire, Spisso did not enter the engine room and did not descend the engine room stairs. (See 6/9/21 Tr., DE # 264, at 34.) The only person in the engine room during the fire event was Rice.

48. The fire was minor and nearly all of the physical damage to the Epic was limited to the tool bag itself, the rubber floor mats it was resting on, and the flooring underneath. All other damage was related to smoke and soot in the engine room.

49. After Rice extinguished the fire, the Captain restarted the engines and navigated the Epic to the nearest port, where it was met by Hatteras's service manager, Baird Paschal. The Epic operated under its own engine power. No commercial tow or Coast Guard assistance was needed.

50. Neither Spisso nor his guests sought medical treatment in North Carolina following the fire, nor at any point after returning to Miami. Spisso did not introduce any medical records, medical expert opinions, or other competent evidence of any medical

treatment or any medical expenses for any injuries allegedly caused by exposure to the fire.

51. The Epic contained a Sea-Fire, pre-engineered fire suppression system. The system did not activate in response to the fire.

52. This system includes a heat-activated cannister or cylinder, which distributes a fire extinguishing agent when the frangible bulb reaches the requisite temperature. (6/10/21 Tr., DE # 265, at 49.) Per the installation instructions, the fire cannister should be installed in the middle of the two engines as close to the center of the engine compartment as possible, and within two to three feet of the ceiling. (6/10/21 Tr., DE # 265, at 107–08, 129, 131; 6/14/21 Tr., DE # 267, at 153–54, 176.)

53. The fire cannister aboard the Epic was installed to the starboard (right) side, near the corner of the engine room. (6/14/21 Tr., DE # 267, at 153–54, 176–77.)

54. The corner of the engine room is an area of dead air space, where heat does not elevate quickly. Activation of the fire system requires heat flow from the fire. (6/10/21 Tr., DE # 265, at 107.)

55. Spisso was provided a copy of the fire suppression system installation manual prior to accepting delivery of the boat, with his delivery documents.

56. The fire cannister was not installed in compliance with the instruction manual.

57. The Epic also contained a manual fire system. The manual fire system allows an individual to activate the fire suppression system by pulling a handle at the vessel's helm. (6/10/21 Tr., DE # 265, at 50–51.) The manual system includes a safety pin, designed to prevent accidental activation of the system. The safety pin was not removed from the manual system prior to the vessel's maiden voyage, as required. (Id. at 51–52.)

58. The Epic also contained a fire alarm system. This system included sensors in the engine room which were designed to sound alarms and activate lights throughout the vessel if the engine room sensors detected the requisite amount of heat. (See 6/9/21 Tr., DE # 264, at 62; 6/10/21 Tr., DE # 265, at 96.) The sensors detected a fire or heat event in the engine room on the date of the fire. (See, e.g., 6/9/21 Tr., DE # 264, at 83–84.)[2] The alarms and lights did not activate on the date of the fire. (Id. at 58.)

## E. Post-fire Dealings of the Parties

59. After the fire, Spisso instructed Paschal to "take [the Epic] back." (6/9/21 Tr., DE # 264, at 62.) Spisso departed from North Carolina, while the Epic returned to Hatteras's facility in New Bern.

60. While Spisso instructed Hatteras to take back the vessel, in part, "because [] the fire extinguishing systems did not work," (6/9/21 Tr., DE # 264, at 64), the court finds it was unlikely he was aware of the alleged defects with the fire system at that time. Rather, his verbal demand to "take it back" was a result of the fire.

61. Within one week of the fire, Mike Fram, then the interim Chief Executive Officer ("CEO") of Hatteras, traveled to Miami to meet with Spisso regarding how to remedy the situation. (6/14/21 Tr., DE # 267, at 73–74.)

62. Fram, acting in his capacity as interim CEO of Hatteras, had discussions with Spisso to try to reach an agreement to resolve any issues with respect to the Epic, including the repair of any damage caused by the fire. (6/14/21 Tr., DE # 267, at 74.)

63. At the time, Fram was also employed by Versa and, on occasion, corresponded with

---

[2] Spisso objected to the testimony of John Gioseffi alleging (1) he was not provided Gioseffi's CV, and (2) that Hatteras did not provide data from the vessel's system monitor, which it expected Gioseffi to discuss. Spisso requested an inference as to what the systems monitor data would have shown. At trial, the court took the matter under advisement. Because the court has concluded the system's monitor detected a fire, the requested inference is unnecessary and the motion will be denied.

Spisso from his Versa email address. (Id. at 102.) He also provided Spisso his business card, which reflected his position with Versa. (Id. at 102; 6/9/21 Tr., DE # 264, at 131.) These events occurred after the fire aboard the Epic. (6/14/21 Tr., DE # 267, at 102–03.) In his interactions with Spisso, Fram was acting in his capacity as a Hatteras employee, and his use of his Versa email address and business card was either inadvertent or a matter of convenience.

64. Versa never had any business relationship with Spisso or Acquaviva and was neither a party to the Agreement nor a warrantor of the vessel. It had no role in the construction of the Epic, is not in the business of building or selling yachts, and did not issue any warranty as to the Epic. Rather, Versa provided management consulting services.

65. Hatteras requested permission to conduct a scope of work and to begin repairs on the vessel. (6/14/21 Tr., DE # 267, at 76–80.) On or after 24 October 2016, Spisso authorized Hatteras to prepare a scope of work to remediate the damage caused by the fire. However, Spisso refused to authorize the repairs and also refused to take possession of the Epic, leaving it in Hatteras's custody at its facility in New Bern. (6/14/21 Tr., DE # 267, at 84–86.)

66. The Epic remained moored at Hatteras's dock from September 2016 to 27 February 2017. While Hatteras was in possession of the Epic, it provided electricity, safe dockage, and inspection to ensure the vessel remained properly moored with working bilge pumps, batteries, A/C, and similar necessaries. (6/10/21 Tr., DE # 265, at 9–10.) Spisso and Acquaviva benefited from these necessaries because the yacht remained protected and maintained during this period. Hatteras did not gain a financial benefit from its possession of the Epic, nor did Hatteras use the Epic for its own benefit during that period of time.

67. The cost of the services provided by Hatteras through 11 January 2017, according to Hatteras was $19,367.85, which was based upon pricing for such services at various marinas in the geographic area. Hatteras continued to provide necessaries to the vessel through and until 27 February 2017. (Pl.'s Ex. 18; 9/10/21 Tr., DE # 265, at 9–12.)

68. Hatteras's charges, (see Pl.'s Ex. 18), reflect the fair market value for such services in the geographic area in and around New Bern.

69. Hatteras has no personal knowledge of any boat washing that occurred nor how many times it may have occurred. (6/10/21 Tr., DE # 265, at 25.) It does not know what the $500.00 charge for transportation costs was for, (id. at 25), and does not have records to document the galley store dockage or transportation fees, (id. at 27.) It also could not locate any receipts from the captain for fees in the amount of $3,740.85. (Id. at 28.)

70. Hatteras notified Spisso that the vessel was incurring charges for necessaries and asked that he remove the vessel from Hatteras's property. (See, e.g., 6/14/21 Tr., DE # 267, at 81, 85, 91.) These actions and the associated correspondences demonstrate that Spisso continued to exercise ownership rights over the Epic, which Hatteras acknowledged.

71. In November 2016, Ronald Doerr arrived at Hatteras's property to inspect the Epic on behalf of Spisso and Acquaviva when Hatteras was not expecting him. While Doerr was briefly refused access to the vessel, he was invited to examine the vessel later the same day. (6/11/21 Tr., DE # 266, at 64–65; 6/14/21 Tr., DE # 267, at 88.)

72. After the fire and while the Epic was moored at Hatteras's facility, Gregory Poole Equipment Company took the Epic on a limited sea trial in order to assess the condition of the engines. (6/14/21 Tr., DE # 267, at 50, 53; 6/9/21 Tr., DE # 266, at 100–01.) This sea trial was not conducted or ordered by Hatteras. (6/14/21 Tr., DE # 267, at 94.)

73. Beginning in November 2016, both Spisso and Hatteras were represented by their

respective counsel in all attempts to resolve the dispute and come to a satisfactory agreement. Hatteras made multiple separate settlement offers to Spisso, all of which he rejected.

74. Hatteras's settlement offers included an offer to make all repairs necessary to restore the Epic to "like-new" condition and allow Spisso to keep it or assist him in selling it. (6/14/21 Tr., DE # 267, at 74, 82, 87.) Hatteras contacted Gregory Poole, the engine distributor, to determine what work would be required in order to reinstate the engines' warranties. (Id. at 92.) The engines' warranties were ultimately reinstated. (Id. at 54; 6/11/21 Tr., DE # 266, at 37–38.)

75. In February 2017, Spisso and his representatives took the vessel under the guise of performing a "sea trial." (See 6/11/21 Tr., DE # 266, at 67–68.) Spisso departed from the Hatteras facility with the vessel without paying for the necessaries provided by Hatteras. (Id.; 6/9/21 Tr., DE # 264, at 124–25.)

76. Hatteras then instituted this lawsuit, asserted a maritime lien against the Epic, and had it arrested in order to recover the money owed for necessaries. Acquaviva posted a bond and secured the vessel's release.

77. Spisso took the Epic to Ocean Marine Yacht Center ("Ocean Marine") for repairs. He has no knowledge as to whether Ocean Marine is an authorized Hatteras dealership. Spisso presented no evidence that he presented any warranty claim to the manufacturer of the fire suppression system, or had an authorized service provider inspect it.

78. Once the Epic arrived at Ocean Marine, the Epic's hull and machinery insurer hired a surveyor to inspect it and prepare a scope of work. (6/10/21 Tr., DE # 265, at 140.)

79. Once repair work commenced, components of the engines were removed from the Epic, disassembled, and stored. (6/11/21 Tr., DE # 266, at 46–47.) The engines

remained in this condition for approximately one year. (Id. at 47.)

80. At one point, due to delays, Ocean Marine shrink wrapped the Epic and moved it outside as no work was being done. (See 6/11/21 Tr., DE # 266, at 41–42.)

81. Ocean Marine's charges totaled approximately $663,000 to $700,000. (See 6/11/21 Tr., DE # 266, 23–24.) This amount included items that were unrelated to the fire itself, including work stoppage charges, relocation of the fire suppression cylinder in the engine room, and other requested work that is not at issue in this lawsuit.

82. The Epic's hull and machinery insurer paid part of the final invoice to Ocean Marine. (See 6/9/21 Tr., DE # 264, at 75–77; 6/11/21 Tr., DE # 266, at 24–25.) Spisso paid some amount to Ocean Marine. (6/9/21 Tr., DE # 264, at 75–77; 6/11/21 Tr., DE # 266, at 24–25.) It is unclear the exact amount Spisso paid to Ocean Marine, what any payments were for, and whether or how much he was reimbursed by the insurer. (6/9/21 Tr., DE # 264, at 75–77; 6/11/21 Tr., DE # 266, at 24–25, 94.)[3]

Based on the foregoing findings of fact, the court makes the following:

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

1. The Court has jurisdiction over this matter. 28 U.S.C. § 1333.

### B. Hatteras's Necessaries Claim

2.

> [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>
> (1)     has a maritime lien on the vessel;
> (2)     may bring a civil action in rem to enforce the lien; and
> (3)     is not required to allege or prove in the action that credit was

---

[3] At trial, Hatteras argued Spisso had violated Federal Rule of Civil Procedure 26 by failing to produce receipts of payment about which Oscar Sanchez testified. (6/11/21 Tr., DE # 266, at 119.) Hatteras also moved to strike this testimony. Because this testimony does not impact the court's findings and conclusions herein, the oral motions will be denied as moot.

given to the vessel.

46 U.S.C. § 31342. "A maritime lien is '[a] lien on a vessel, given to secure the claim of a creditor who provided maritime services to the vessel[.]'" World Fuel Servs. Trading v. Hebei Prince Shipping Co., 783 F.3d 507, 509 (4th Cir. 2015) (quoting Black's Law Dictionary 1065 (10th ed. 2014))

3. The services Hatteras claims as damages constitute necessaries. (DE # 189, at 49-50.)

4. Spisso claims that he justifiably revoked his acceptance of the Epic, and thus he cannot be held liable for the necessaries because title had transferred back to Hatteras as a matter of law. N.C. Gen. Stat. § 25-2-401(4) provides:

> A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a 'sale.'

5. To establish revocation was justifiable, the buyer must establish:

> (1) that the goods contained nonconformity that substantially impaired their value to him, G.S. 25-2-608(1); (2) that he either accepted the goods knowing of the nonconformity but reasonably assuming that it would be cured, G.S. 25-2-608(1)(a), or that he accepted the goods not knowing of the nonconformity due to the difficulty of discovery or reasonable assurances from the seller that the goods were conforming, G.S. 25-2-608(1)(b); (3) that revocation occurred within a reasonable time after he discovered or should have discovered the defect, G.S. 25-2-608(2); and (4) that he notified the seller of his revocation, G.S. 25-2-608(2).

Harrington Mfg. Co. v. Logan Tontz Co., 253 S.E.2d 282, 286 (N.C. Ct. App. 1979) (citations omitted).

6. The threshold question in a case of revocation "is whether the goods have a nonconformity which substantially impairs [their] value to the buyer." Allen v. Rouse Toyota Jeep, Inc., 398 S.E.2d 64, 65 (N.C. Ct. App. 1990). This is a two-part inquiry which considers both the buyer's subjective reaction to the alleged

15

defect (taking into account the buyer's needs, circumstances, and reaction to the nonconformity) and the objective reasonableness of this reaction (taking into account the goods market value, reliability, safety, and usefulness for purposes for which similar goods are used, including efficiency of operation, cost of repair of nonconformities, and the seller's ability or willingness to seasonably cure the nonconformity).

Id.

7. Spisso did not justifiably revoke his acceptance of the Epic based on any defects with the fire system.

8. Even assuming Spisso's attempted revocation was due to the alleged defects in the fire system and assuming there were defects in the fire system, he did not justifiably revoke acceptance of the Epic. The costs of repairing the alleged defects—the location of the cannister, the functioning of the alarms/lights, and the manual system's safety pin—are nominal, particularly when compared to the Epic's value. (See, e.g., 6/11/21 Tr., DE # 266, at 32, 49; see also 6/10/21 Tr., DE # 265, at 105 (noting the expert corrected the location of the safety pin after his inspection).) These alleged defects do not substantially impair the value of the vessel. Thus, Spisso's reaction and attempt to revoke his acceptance of the Epic were objectively unreasonable.

9. As such, title remained vested with Acquaviva during the time that Hatteras provided necessaries between September 2016 and February 2017, and Spisso and Acquaviva are liable for the reasonable costs of the same.

10. There is insufficient evidence to support Hatteras's claim for boat washing, transportation costs, galley store dockage, transportation fees, or captain fees.

11. Hatteras is entitled to recover damages for its claim of breach of maritime contract for providing necessaries to the Epic in the amount of $17,382.25[4] plus prejudgment

---

[4] Hatteras seeks $24,340.52. (See Compl., DE # 1.) The invoice totals $19,367.85. (Pl.'s Ex. 18.) $6,475.85 is deducted from the invoice for the boat washing, transportation costs, galley store dockage, transportation fees, and captain fees. The

interest as provided by maritime law. See U.S. Fire Ins. Co. v. Allied Towing Corp., 966 F.2d 820, 828 (4th Cir. 1992) ("Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic . . . ." (citations omitted)); Sears v. Sailing Vessel Smithereens, No. ELH-13-3389, 2014 U.S. Dist. LEXIS 80581, at *13 (D. Md. June 13, 2014) (awarding pre-judgment interest on a claim for necessaries and noting "[a] award of prejudgment interest is almost automatic, and should be denied only under exceptional circumstances." (citation omitted)).

## C. Versa's Agency

12. "[A]n agent is one who acts for or in the place of another by authority from him. Two factors are essential in establishing an agency relationship: (1) the agent must be authorized to act for the principal; and (2) the principal must exercise control over the agent." Sullivan v. Pugh, 814 S.E.2d 117, 120 (N.C. Ct. App. 2018) (quoting Leiber v. Arboretum Joint Venture, LLC, 702 S.E.2d 805, 811 (N.C. Ct. App. 2010)).

13. In the absence of an actual agency relationship, a party may be liable for the acts of another based on the doctrine of apparent agency. Sweatt v. Wong, 549 S.E.2d 222, 227 (N.C. Ct. App. 2001). Apparent agency arises when "'a person by words or conduct represents or permits it to be represented that another person is his agent' when no actual agency exists." Phillips v. Rest. Mgmt. of Carolina, L.P., 552 S.E.2d 686, 695 (N.C. Ct. App. 2001) (quoting Knight Publ'g Co. v. Chase Manhattan Bank, 479 S.E.2d 478, 487 (N.C. Ct. App. 1997)). Apparent agency may not be relied upon to assert that a principal authorized a transaction "'unless the third party *actually relied*

---

invoice covers charges incurred through 11 January 2017. (Compl., DE # 1-1.) The vessel was not removed from Hatteras's property until 27 February 2017. The invoice reflects the vessel incurred daily charges of $78.25 and weekly charges of $125.00. Thus, the vessel incurred an additional $4490.25 in charges before it was removed from Hatteras's property.

upon the assertions of the principal regarding the purported agent's power at the time of the transaction.'" Id. (quoting Knight, 479 S.E.2d at 487); see also Hoffman v. Moore Regional Hosp., 441 S.E.2d 567, 570 (N.C. Ct. App. 1994) (noting a principal is liable for harm caused by its apparent agent "if the third party justifiably relied on the principal's representation").

14. Because Fram's correspondence with Spisso from his Versa email address, and his provision of his Versa business card, occurred *after* the fire, such acts do not support Spisso's claim that Hatteras was Versa's agent in the negotiation of the Agreement.

15. Even assuming Versa indicated Hatteras was authorized to act as its agent, Spisso did not rely on any such assertion or on the belief that there was agency relationship between Versa and Hatteras.

16. Hatteras was not Versa's actual or apparent agent, and therefore, Versa has no liability to Spisso or Acquaviva for any of the causes of action alleged against it.

**D. Spisso and Acquaviva's Breach of the Agreement Claim**

17. Hatteras did not breach the Agreement by delivering a yacht that was not a 2017 model or by delivering a yacht that was not "new" due to the age of the engines.

18. "In order to recover compensatory damages in a contract action, plaintiff must show that the damages were the natural and probable result of the acts complained of and must show loss with a reasonable certainty, and damages may not be based upon mere speculation or conjecture." United States Life Ins. Co. v. Mechanics & Farmers Bank, 685 F.2d 887, 895 (4th Cir. 1982) (quoting Pike v. Wachovia Bank & Trust Co., 161 S.E.2d 453, 466 (N.C. 1986)).

19. Spisso failed to present credible evidence that the faulty location of the fire cannister was the natural and probable cause of any damages. Spisso failed to establish that he

suffered harm, and if so, how much harm he suffered, as a result of the fire canister's improper installation. As such, he is not entitled to recover for such defect.

20. The alleged inability to activate the manual fire system did not cause or contribute to any damages aboard the Epic. Spisso failed to establish that he suffered harm, and if so, how much harm he suffered, as a result of the safety pin's incorrect location. As such, he is not entitled to recover for such defect.

21. The failure of the fire alarms and lights to activate was not the natural and probable cause of any damages. As such, Spisso is not entitled to recover for such defect.

22. Acquaviva may not recover under breach of contract because it was not a party to the Agreement.

## E. Spisso and Acquaviva's Breach of Implied Warranties Claim

23. The HELW was a material term of the Agreement.

24. The HELW is applicable to Spisso.

25. The HELW meets all of the legal requirements to disclaim implied warranties of merchantability and fitness for a particular purpose. See N.C. Gen. Stat. § 25-2-316(2) (requiring exclusions to be conspicuous and mention "merchantability"); Indura S.A. v. Engineered Controls Int'l Inc., No. 1:10-CV-457, 2011 U.S. Dist. LEXIS 99118, at *98 (M.D.N.C. Sept. 1, 2011) (finding disclaimer sufficient where it appears in all capital letters and includes the requisite statutory language).

26. Hatteras effectively disclaimed any implied warranties as to the Epic, and Spisso is bound by the terms of the HELW.

## F. Spisso and Acquaviva's Breach of Express Warranty Claim

27. Under North Carolina law, a claim for breach of express warranty "requires proof of '(1) an express warranty as to a fact or promise relating to the goods, (2) which was

19

relied upon by the plaintiff in making his decision to purchase, (3) and that was breached by the defendant.'" Harbour Point Homeowners' Ass'n v. DJF Enters., 697 S.E.2d 439, 447 (N.C. Ct. App. 2010) (quoting Hall v. T.L. Kemp Jewelry, Inc., 322 S.E.2d 7, 10 (N.C. Ct. App. 1984)).

28. The only warranty applicable to the Epic is contained in the HELW. (Pl.'s Ex. 10.)

29. Having concluded the Epic was a new 2017-year model 70-foot yacht on the date of delivery, Spisso's claim for breach of warranty on that basis fails.

30. The fire itself does not constitute a breach of the Agreement or the HELW. (DE # 189, at 30.)

31. As to the fire system, Spisso alleges that it was defective because it was not correctly installed and because a safety pin was not removed after construction.

32. Aside from his signing the HELW prior to accepting the vessel, Spisso offers no evidence that he *relied* on the warranty in deciding to purchase the vessel. Cf. Wheeler v. BMW of N. Am. LLC, No. 3:20-CV-36, 2020 U.S. Dist. LEXIS 253071, at *21–22 (W.D.N.C. June 25, 2020) (finding plaintiff sufficiently pled reliance where she alleged the warranty was the basis of her bargain to purchase and would not have otherwise purchased the vehicle, or would have paid less for it without the warranty).

33. Even assuming Spisso presented sufficient evidence of reliance, he presented no evidence of his efforts to comply with his obligations under the HELW. (See Pl.'s Ex. 10, at 2; see also 6/9/21 Tr., DE # 264, at 110–11.)

34. Even assuming Spisso presented sufficient evidence to establish a breach of warranty, pursuant to the HELW he is entitled to "the remedy of repair or replacement of parts or materials that are found to be defective." (Pl.'s Ex. 10, at 2.) Spisso failed to offer sufficient evidence of the cost of repairing the fire system or its components. (See, e.g.,

6/9/21 Tr., DE # 264, at 77 (Spisso testifying he does not remember how much repairs to the fire system costs).)

35. Finally, to the extent Spisso argues the fire system's instruction manual was a separate warranty, and assuming the HELW was invalid or did not apply to Spisso, he presented insufficient evidence of his reliance on that document and insufficient evidence of the cost to repair or replace the fire system.

36. As such, Spisso is not entitled to recover for breach of warranty.

37. Hatteras never made any warranty, either express or implied, to Acquaviva. Therefore, Acquaviva may not recover under these claims.

**G. Spisso and Acquaviva's Magnuson-Moss Warranty Act Claim**

38. "The [Magnuson-Moss Warranty Act ("MMWA")] allows a consumer to bring suit for damages caused by 'the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract.'" Boggs v. BMW of N. Am., LLC, No. 5:20-CV-00023, 2020 U.S. Dist. LEXIS 193573, at *3–4 (E.D.N.C. Oct. 19, 2020) (quoting 15 U.S.C. § 2310(d)(1)). Because the HELW is a limited warranty, the MMWA looks to North Carolina law for guidance on the damages available. See id. at *4.

39. Under North Carolina law, "'[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted.'" Id. at *6 (quoting N.C. Gen. Stat. § 25-2-714(2)). "A buyer's incidental and consequential damages may be recoverable as well." Id. (quoting N.C. Gen. Stat. § 25-2-715).

40. As discussed above, there is insufficient evidence that Hatteras breached the HELW or any other warranty. There is also insufficient evidence that Spisso provided the

requisite notice and opportunity to cure. Finally, Spisso and Acquaviva presented insufficient evidence of the amount of damages caused by any alleged breach of warranty. Therefore, neither Spisso nor Acquaviva can recover under the MMWA.

**H. Spisso and Acquaviva's Negligence Claim**

41. Negligence is the failure to use reasonable care under the existing circumstances. Goodman v. Wenco Foods, Inc., 423 S.E.2d 444, 457 (N.C. 1992). To state a claim for negligence, "a plaintiff must plausibly allege 'the essential elements of negligence: duty, breach of duty, proximate cause, and damages.'" Markel Am. Ins. Co. v. XDS, LLC, No. 7:20-CV-00075, 2020 U.S. Dist. LEXIS 153755, at *8 (E.D.N.C. Aug. 24, 2020) (quoting Olds v. United States, 473 F. App'x 183, 185 (4th Cir. 2012)). "Negligence is not presumed from the mere fact of injury." Roumillat v. Simplistic Enters., 414 S.E.2d 339, 345 (N.C. 1992), abrogated on other grounds by Nelson v.Freeland, 507 S.E.2d 882 (N.C. 1998).

42. Rice's transportation of the butane lighter was not subject to 49 C.F.R. § 173.308, including its packaging requirements.

43. Spisso nor Acquaviva offered credible evidence that Rice failed to use reasonable care under the circumstances. As such, they have failed to establish negligence.

44. Spisso and Acquaviva also failed to establish recoverable property and personal injury damages as a result of the fire.

**I. Spisso and Acquaviva's Conversion Claim**

45. Conversion is "'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner['s] rights.'" Directv, Inc. v. Rector, No. 5:03-cv-164, 2005 U.S. Dist. LEXIS 64012, at *5 (W.D.N.C. Mar. 2, 2005) (quoting Norman v.

<u>Nash Johnson & Sons' Farms, Inc.</u>, 537 S.E.2d 248, 264 (N.C. Ct. App. 2000)). "'The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner. . .'" <u>Id.</u> (quoting <u>Lake Mary Limited P'ship v. Johnston</u>, 551 S.E.2d 546, 552 (N.C. Ct. App. 2001)).

46. Hatteras's brief delay of Doerr's access to the Epic does not amount to a wrongful deprivation of property.

47. Gregory Poole Equipment Company's limited sea trial does not amount to a wrongful deprivation of property by Hatteras.

48. Hatteras did not wrongfully possess or convert the Epic while it was moored at the Hatteras facility in New Bern, North Carolina between September 2016 and February 2017.

**J. Spisso and Acquaviva's Abuse of Process Claim**

49. Abuse of process requires proof of "(1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceeding." <u>Spirax Sarco, Inc. v. SSI Eng'g, Inc.</u>, 122 F. Supp. 3d 408, 430 (E.D.N.C. 2015) (citing <u>Barnette v. Woody</u>, 88 S.E.2d 223, 227–28 (N.C. 1955)).

50. Hatteras instituted the arrest action to collect money that was actually owed to it for maritime necessaries it provided to the Epic, and Hatteras did not seek the arrest of the vessel for an ulterior purpose or abuse process in any way.

**K. Spisso and Acquaviva's Bad Faith Claim**

51. "Under North Carolina law, every contract contains 'an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.'" <u>Cordaro v. Harrington Bank, FSB</u>, 817 S.E.2d 247, 256 (N.C. Ct. App. 2018) (quoting <u>Bicycle Transit Auth. v. Bell</u>, 333

S.E.2d 299, 305 (1985)). Generally, when a "claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, we treat the former claim as 'part and parcel' of the latter." Id. (citations omitted); see also Suntrust Bank v. Bryant/Sutphin Props., LLC, 732 S.E.2d 594, 603 (N.C. Ct. App. 2012) ("As the jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts."), disc. review denied, 735 S.E.2d 180 (N.C. 2012).

52. Hatteras did not breach the implied covenant of good faith and fair dealing.

**L. Spisso and Acquaviva's Unfair and Deceptive Trade Practices Act Claim**

53. A claim for unfair or deceptive trade practices under Chapter 75 of the North Carolina General Statutes ("UDTPA") requires a plaintiff to show:

> (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business. A practice is deceptive if it has the capacity or tendency to deceive the average consumer, but proof of actual deception is not required. The plaintiff need not show fraud, bad faith, deliberate acts of deception or actual deception, but must show that the acts had a tendency or capacity to mislead or created the likelihood of deception.

Spartan Leasing Inc. v. Pollard, 400 S.E.2d 476, 482 (N.C. Ct. App. 1991) (internal quotation marks and citations omitted). "Whether the practice is unfair depends upon the facts of each case and the impact the practice has in the marketplace." Id. (citation omitted).

54. However, "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UDTPA,] N.C.G.S. § 75-1.1." Branch Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 700 (N.C. Ct. App. 1992).

55. Spisso nor Acquaviva presented credible evidence of Hatteras's deceptive or unfair

conduct, and therefore, Hatteras is not liable under the UDTPA.

## III. **CONCLUSION**

Based on the foregoing, it is hereby ORDERED, ADJUDGED, AND DECREED that:

A. Plaintiff, Hatteras/Cabo Yachts, LLC, shall have and recover the sum of $17,382.25 from Daniel Spisso and Acquaviva, Ltd., jointly and severally, plus

    a. Pre-judgment interest at the legal rate of 8% per annum from 11 January 2017 until the date of entry of judgment, and

    b. Post-judgment interest at the legal rate from the entry of judgment until paid pursuant to 28 U.S.C. § 1961.

B. Counterclaim plaintiffs Daniel Spisso and Acquaviva, Ltd. shall have and recover nothing.

Hatteras's motion for attorney's fees, (DE # 253), will be decided by separate order. Because Spisso never attempted to call Richard Thompson at trial, Hatteras's motion in limine to exclude his testimony, (DE # 224), is DENIED as moot. Hatteras's 11 June 2021 motion for sanctions, 11 June 2021 Rule 26 motion, and 11 June 2021 motion to strike testimony of Oscar Sanchez are all DENIED. Hatteras's 14 June 2021 Rule 37 motion is DENIED. Spisso's Rule 26 motion regarding the testimony of John Gioseffi is DENIED. Spisso's Rule 52(b) motion for amended or additional findings is DENIED. Hatteras's 14 June 2021 Rule 52 motion is GRANTED.

The Clerk is DIRECTED to enter judgment accordingly.

This 29 September 2021.

_____

W. Earl Britt
Senior U.S. District Judge